Romaine T. WORSTER, Plaintiff,

v.

UNITED STATES POSTAL SERVICE,
William J. Henderson, Postmaster
General, Defendant.

No. 1:99CV00726.

United States District Court,
M.D. North Carolina.

March 21, 2001.

Mark Floyd Reynolds, II, High Point, NC, for plaintiff.

Gill P. Beck, Office of U.S. Attorney, Greensboro, NC, for defendant.

## MEMORANDUM OPINION

OSTEEN, District Judge.

Plaintiff Romaine T. Worster (Worster) filed this action against Defendant William J. Henderson, Postmaster General, United States Postal Service (USPS), alleging a violation of Title VII of the Civil Rights Act of 1964. This matter is now before the court on Defendant's motion for summary judgment and motion to strike certain exhibits. Plaintiff alleges that Defendant discriminated against her on the basis of sex by firing her for conduct similar to conduct committed by male employees that did not result in their removal. Plaintiff also alleges that she was subject to a hostile work environment in violation of Title VII.

For the reasons herein, the court will grant both of Defendant's motions.

## I. FACTUAL BACKGROUND

This action arises out of an unfortunate history of tension and divided loyalties in the West Market Street location of the USPS (the Westside Station). Plaintiff

found herself in conflict with many of her co-workers when she began to voice anti-union sentiments at work and in the media following her resignation from her union, the National Association of Letter Carriers (NALC), in 1989. Based on the statements of various employees of the Westside Station, Worster was the target of some hostility as the result of her affiliation with the "management side" of the USPS. Matters came to a head on August 3, 1994, when Plaintiff made several death threats against co-worker Richard LaVere (LaVere) following an exchange between them regarding her working off the clock. As a result of Plaintiff's threats, she was first suspended and then removed from employment with the USPS on October 4, 1994.

Serving as a backdrop to the tensions in the Westside Station were conflicts and violence in post offices nationwide. On February 8, 1988, the director of City Operations in Greensboro sent a letter to all USPS employees stating that since "heated disputes or fights among [employees] or with their supervisors ... obviously are not conducive to workplace harmony and efficiency, such situations where hard feelings have erupted into violent interpersonal conflict or fights must be removed from the work place." (Def.'s Br. Supp. Mot. Summ. J., Ex. B.) Further, the letter warned employees that they were subject to disciplinary action, including discharge, for engaging in physical assault or initiating threatening language or gestures.

Then on November 14, 1991, a disgruntled postal employee in Royal Oak, Michigan, went on a shooting rampage that left the shooter and three others dead and six wounded. *See Worker Stress Said to Spark Violent Acts; Increase in On–the–Job Violence Is Linked to Stress in Workplace,* BALTIMORE EVENING SUN, Nov. 15, 1991, at A4. Co-workers said the man had threatened to shoot up the post office if he did not get his job back. The Royal Oak shooting followed closely on the heels of another postal shooting in Ridgewood, New Jersey, where another fired postal worker killed four people. *Id.* In August 1986, a part-time carrier in Edmond, Oklahoma, killed 14 people before fatally shooting himself. *Id.* In the eight years prior to the Royal. Oak shooting, postal workers fired on colleagues in at least five other post offices in Alabama, California, Louisiana, New York, and South Carolina. *Id.*

In response to the Royal Oak tragedy, various groups and the USPS issued a "Joint Statement on Violence and Behavior in the Workplace" (the Joint Statement) on February 14, 1992. The Joint Statement declared that "there is no excuse for and will be no tolerance of violence or any threats of violence by anyone at any level of the Post Office." (Def.'s Br. Supp. Mot. Summ. J., Ex. C.) Furthermore, the notice stated that "there is no excuse for and will be no tolerance of harassment, intimidation, threats, or bullying by anyone." (*Id.*) The Joint Statement warned that "[t]hose who do not treat others with dignity and respect will not be rewarded or promoted [and those whose behavior continues] will be removed from their positions." (*Id.*) The Greensboro district manager followed up the Joint Statement the next year with a July 2, 1993, warning to all employees that *"violence of any kind will not be tolerated in the work place."* (Def.'s Br. Supp. Mot. Summ. J., Ex. D.) Further, employees were warned that anyone engaging in physical assaults or initiating threatening language or gestures was subject to disciplinary action, including discharge.

These events led up to Plaintiff's removal. The facts surrounding Plaintiff's termination, stated in the light most favorable to Plaintiff, are as follows.[1] At the time of

---

1. The court has not included several allegations regarding comments made by other co-workers to Plaintiff, as she did not report them at the time and only supports them with her own deposition. Because management was not informed of these alleged outbursts,

the August 3, 1994, incident, Plaintiff had been a USPS employee for approximately 29 years and was a letter carrier for the Westside Station. Worster alleges that several events led to mounting tension between her and some union members at the station. On February 9, 1992, the *Greensboro News & Record* published a guest column written by Worster that explained why she "seceded" from the union.[2] According to Plaintiff, certain union members reacted unfavorably and began to harass her. LaVere, who was vice president of the Westside branch of NALC at the time, allegedly continuously harassed Worster about her views. In April 1992, Worster was invited to a White House ceremony, for which she requested and was granted emergency leave. The leave resulted in a threatened "sick-out" by union shop stewards, which did not occur, and a warning letter and seven-day suspension for Plaintiff, both of which were quashed. Ultimately, Plaintiff was not disciplined for taking the emergency leave day.

In September 1993, *Newsweek* published a "My Turn" column by Worster that was critical of unions and their "anti-management" philosophy, again spurring harassment from some pro-union employees. Worster also authored "An Immodest Proposal for Federal Workers on the Washington Front," criticizing a White House proposal requiring all federal employees to pay union dues (a closed shop), which appeared in the *Greensboro News & Record* Sunday editorial section on June 19, 1994.

A fellow postal worker then wrote a responsive letter to the editor, to which Worster responded in her own letter to the editor on July 8, 1994.[3] Plaintiff alleges that these articles led to increasingly hostile treatment from co-workers, including unspecified name calling and unkind statements. In late July 1994, a few days before Worster threatened LaVere, the Westside Station manager, Frank Glenn (Glenn), took away the employees' coffee privileges, and LaVere and Worster had a dispute over the issue.

The incident resulting in Plaintiff's removal occurred on the afternoon of August 3, 1994, after Plaintiff returned from her delivery route. While accounts of LaVere's motivations and treatment of Plaintiff differ, all parties agree on the words and conduct of Worster. Plaintiff clocked out around 3:00 p.m., but then returned to her case (work area) to tray some mail that had been placed on her ledge while she was in the restroom. The USPS's agreement with the union prohibits employees from working off the clock, which prompted LaVere, who was acting as a temporary shop steward at that time, to approach Worster. LaVere questioned Plaintiff as to whether she was working off the clock.[4] Plaintiff responded, "Why? What's it to you?" (Pl.'s Dep. at 37.)

LaVere informed Worster that, as shop steward, it was his business whether she was following workplace rules. Worster, who stated that she had reached her

they are irrelevant to the question of how the USPS handled violations similar to Plaintiff's death threats.

**2.** Plaintiff has not authenticated this article, nor is it available on Westlaw. It will nonetheless be included in Plaintiff's factual allegations. The date of the article is based on a photocopy of a rebuttal written by Richard Koritz, the Westside Station's union president and a co-worker of Plaintiff, which referred to a February 9, 1992, column written by Worster.

**3.** The court will address Defendant's arguments regarding his motion to strike the

newspaper articles as exhibits later in this memorandum opinion.

**4.** Worster alleges that LaVere approached her in a defiant manner that caused her to become incensed, while LaVere and others contend that he questioned her in a calm and respectful manner. LaVere testified in his deposition that he approached Worster after a group of employees informed him that she was inside working off the clock. While LaVere's approach may be relevant to explaining Worster's anger, it is not relevant to the issue of her conduct and subsequent removal, because no one alleges that LaVere threatened her in any way on August 3, 1994.

breaking point with all the hostility she had encountered since voicing her anti-union sentiments, stated to LaVere, "[I]f you don't quit threatening me and quit threatening my livelihood and harassing me, I'm going to fucking kill you."[5] (Pl.'s Dep. at 38.) LaVere, who had been accompanied by employee Ben Atkinson, then asked Atkinson if he had heard what Plaintiff said.[6] Plaintiff threw a handful of mail on the floor in front of LaVere, who turned and left Worster's area.[7]

LaVere then went to the office of supervisor Keith Nelson (Nelson) to report the incident.[8] Worster testified in her deposition that she yelled, "All these men in here, they just—can't they just do their work instead of being [blah, this, and that]? . . . I can't take this shit anymore. I'm on Prozac. I've gone nuts, and people should leave me alone." (Pl.'s Dep. at 39.) Worster then testified that she entered Nelson's office and interrupted LaVere, shouting, "Yeah, you little twirp. In your reporting this, didn't you hear what I said? I said if you didn't leave me alone, I was going to kill you." (Pl.'s Dep. at 39.)

Nelson walked her out of his office and told her to go home, but she went back to LaVere's case and told him, "I just want to beat the crap out of you. Let's go out in the parking lot and settle this mano et mano." (Pl.'s Dep. at 40.) When LaVere did not respond, Worster left the building, but she waited in the parking lot for LaV-

ere. He did not appear, but Worster told fellow co-workers that they should "stick around and watch me . . . kick his ass." (*Id.*) Plaintiff left the parking lot without seeing LaVere again and drove to the office of Carter Gillespie (Gillespie), the Employee Assistance Program counselor. Gillespie advised Worster to seek a mental health evaluation at Charter Hospital.

The evening of August 3, a postal inspector and Glenn came to Plaintiff's residence to present her with a notice of emergency suspension and to interview her about the incident. According to Plaintiff, Glenn told her that he did not believe she would lose her job, but that she would be issued "some very heavy discipline." (Pl.'s Compl. at 10.) After a month-long hospitalization, Plaintiff returned to work on September 19, 1994, and worked the following two days, until she was notified on the evening of September 21 that she was again being placed under emergency suspension. Worster received a notice of removal on October 4, 1994.

Following her termination, Worster filed two grievances, one protesting her emergency suspension without pay and the other her removal.[9] On May 19, 1995, Worster took part in an arbitration hearing regarding her removal. Richard Koritz, the NALC president for the Westside branch, and Regional Administrator Chuck Windham represented Worster at the hearing. The arbitrator on July 25, 1995,

---

5. Plaintiff argues that the court should distinguish Plaintiff's allegedly "conditional" death threats from a straightforward death threat, seemingly because LaVere was only in danger if he bothered Worster. A death threat is a death threat, regardless of the terms accompanying it. To view it otherwise unwisely downplays the seriousness of such words, especially given the tragic spate of workplace shootings in recent years.

6. Atkinson and LaVere both stated that, as required by union regulations regarding exchanges between shop stewards and employees, LaVere requested that Atkinson accompany him as a witness.

7. LaVere and Atkinson stated that Worster actually threw the bundle of mail (approxi-

mately a foot deep) at LaVere's chest, and it fell to the floor.

8. Keith Nelson (Nelson) was a floating supervisor in five Greensboro stations who was assigned to the Westside Station on August 3, 1994. Gloria Haynes Corley was the regular supervisor during that period. Because Nelson was present the day of the incident, he was responsible for making a recommendation as to any disciplinary action against Worster.

9. Worster won the arbitration of her grievance regarding suspension without pay and was given back pay for that period.

found that Worster was properly removed for her verbal death threat against LaVere.

Meanwhile, on March 3, 1995, within 180 days of her termination, Plaintiff filed a charge of sex discrimination with the Equal Employment Opportunity Commission (EEOC). Plaintiff's sex discrimination claim was brought before an EEOC administrative law judge on August 13–14, 1997, who found in favor of Worster. The judge found the violations of several male USPS employees to be sufficiently similar to Worster's death threats and then held that the different punishments the men received were the result of sex discrimination. The USPS rejected the EEOC's factual findings and issued a December 5, 1997, decision denying the relief ordered by the EEOC judge. Worster appealed to the EEOC, Office of Federal Operations, which affirmed the USPS's decision on June 17, 1999. Plaintiff received a right to sue letter from the EEOC on June 21, 1999.

## II. DISCUSSION

### A. Defendant's Motion to Strike Exhibits 4–5, 7–20, and 22

The court first will consider Defendant's motion to strike certain exhibits submitted by Plaintiff in support of her response to Defendant's motion for summary judgment. While a nonmoving party (Plaintiff, in this case) is not required to produce evidence in a form that would be admissible at trial to avoid summary judgment, Federal Rule of Civil Procedure 56(e) "permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c) . . . it is from this list that one would normally expect the nonmoving party to make the showing [that there is a genuine issue of fact for trial]." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (stating that the nonmoving party cannot rely on the pleadings alone to oppose summary judgment). Federal Rule of Civil Procedure

56(c) permits the parties to rely on pleadings, depositions, answers to interrogatories, admissions on file, and affidavits based on personal knowledge that "set forth such facts as would be admissible in evidence." Fed.R.Civ.P. 56(c) and (e). For the reasons that follow, the court finds that the exhibits at issue do not satisfy any of these requirements.

Defendant argues in his motion to strike that Plaintiff has not submitted any depositions or other properly authenticated evidence in support of her contention that she was fired for discriminatory reasons. Plaintiff alleges that male employees who committed similar violations were punished much less severely. In support of this contention, Plaintiff submitted what appear to be notes regarding USPS employment records of various male employees who engaged in threatening or abusive behavior, as well as articles and letters. There are a number of evidentiary defects that make the exhibits at issue inadmissible. It is unclear from where this information was obtained or who compiled it. More importantly, it is unclear which supervisors disciplined the individuals or whether they were in the chain of command of Enola Mixon, the Postmaster of Greensboro during Plaintiff's removal. In addition, several of the exhibits contain inadmissible hearsay. Finally, many of the disputed exhibits are irrelevant to Plaintiff's hostile environment and discrimination claims.

 Two exhibits appear to be copies of newspaper articles containing handwritten notes. One is a feature about Worster and her beliefs about the harmful effects of unionization. *See* Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 4. The second is a guest column by Koritz that responds to a guest column written by Worster criticizing unions. *See* Pl.'s Ex. 7. The court finds that both exhibits are irrelevant, as they have nothing to do with gender discrimination, in addition to being unauthenticated. Moreover, the handwritten notes on the

article about Worster are inadmissible hearsay. Therefore, the court will grant Defendant's motion to strike Plaintiff's Exhibits 4 and 7.

Plaintiff also submitted as Exhibit 5 a copy of a letter written by LaVere, dated January 4, 1990. The letter addresses a confrontation between LaVere and another postal carrier, who allegedly cursed at LaVere. The letter, which was not properly authenticated, is also irrelevant and inadmissible hearsay. Similarly, Plaintiff's Exhibit 22 is an unauthenticated letter from Labor Relations Representative Michael Ellis to Koritz in his capacity as NALC steward. The letter deals with steward duty time and is irrelevant to Plaintiff's claims; it also contains inadmissible hearsay.[10] Therefore, the court will strike Plaintiff's Exhibits 5 and 22.

█ The remainder of Plaintiff's exhibits challenged by Defendant are notes regarding employees who engaged in violent or threatening behavior. Exhibit 8 contains notes about Koritz's employment history with the USPS. There are numerous entries regarding cursing and angry encounters with supervisors from 1988 to the summer of 1990. There is no mention of Koritz uttering death threats or even threats of physical harm, beyond Koritz shaking his finger in another employee's face.

Exhibit 9 contains notes regarding employee Ricardo Harley's violations, none of which involves death threats. However, there were a couple of occasions in which Harley was restrained from assaulting his supervisors. These physical encounters all occurred in 1987 and 1988, several years prior to the Joint Statement regarding "zero tolerance" of violence and threats. Exhibit 9 also contains a list of employee Robert Hill's (Hill) violations which occurred in 1994 and 1995. Hill was given warnings and suspended for improper conduct, including arguing with, intimidating, and threatening co-workers. Hill tried to kick a supervisor and allegedly made constant threatening phone calls to a Greensboro mail facility. The notes indicate that he was placed on off-duty status in June 1995.

Plaintiff's exhibits include notes about several individuals whose violations clearly are not similar to Plaintiff's death threats. Exhibit 11 briefly notes that Bert Watson submitted to a request for a fitness-for-duty-examination following an alleged assault on a fellow employee.[11] In addition, Exhibits 12–16 contain brief entries about A. Campbell, D.E. Alexander, Harold J. Batten, Samuel J. Berry, and Harry Williams, none of whom threatened a coworker; rather, most were disruptive and used improper language in the workplace, except for Berry, who was arrested for drug possession.[12] Likewise, Exhibits 19 and 20 make no mention of death threats, though they do involve threats of physical harm.

10. Plaintiff repeatedly mentions the fact that LaVere should not have been on the USPS clock when he approached Worster and that he was only given a warning letter for his time clock violation. LaVere's administrative violation does not change the fact that Worster uttered repeated death threats against him. While it may be true that LaVere should have clocked out before exercising his duties as shop steward, it has absolutely no relevance to Worster's termination or her discrimination claims.

11. Nelson testified in his deposition that "the story is according to who's telling it. He said that he bumped her with his foot ... like [a] love pat ... She said that he kicked her so

hard it lifted her off the floor ... A lady who's working as close as from here to that hat (indicating) didn't even know it happened." (Nelson Dep. at 42.) The incident involving Watson is therefore quite different from the August 3 incident involving Worster, because no one disputes that she uttered death threats.

12. Plaintiff's Exhibit 16 contains a note to "use as example that USPS won't even discharge individual for drugs." The USPS's policy on drug abuse by employees has no bearing whatsoever on the discipline issued to Worster. Drug abuse is not even mentioned in any of the three warnings issued to employees about workplace violence.

There are three exhibits which contain arguably similar violations involving violence or threats. Exhibit 10, containing notes about Tony Cox (Cox), states that in April 1993 he told a male co-worker that he was "going to bring a gun to work and hurt someone" if he was not scheduled for overtime. (Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 10.) Cox was placed on administrative leave. Exhibit 17 notes that Jamal Muhammed (Muhammed) was removed in January 1997 for stating that "[t]oday is a good day to die." . (*Id.*, Ex. 17.) Muhammed's removal was reduced to a 14–day suspension by labor representative Nick Rinaldi, who did not review Plaintiff's removal. Finally, Exhibit 18 deals with the unfavorable employment history of John Stokes, Jr. (Stokes), who allegedly engaged in a number of altercations and was disciplined several times. The exhibit notes that in August 1993 Stokes threatened a co-worker, "You keep on and I will kill you." (*Id.*, Ex. 18.) The threat allegedly resulted in a 14–day suspension. Stokes was fired two years later.

█ The exhibits regarding Cox, Muhammed, and Stokes all contain information that could have bearing on Plaintiff's discrimination claim. However, none of the exhibits regarding male employees is admissible as evidence. They are not in the form of sworn testimony or affidavits. Nor do the exhibits satisfy the rules of evidence regarding business records; in fact, it is not even clear from where the

information was gathered.[13] Further, they contain inadmissible hearsay. With the exception of Exhibits 10, 17, 18 (dealing with death threats), and possibly 9, 19, and 20 (dealing with assaults), the exhibits also are not relevant to Plaintiff's discrimination claim. Because Plaintiff's exhibits fail to satisfy the rules of evidence, the court will grant Defendant's motion to strike Exhibits 8–20.[14]

### B. Defendant's Motion for Summary Judgment

A summary judgment motion should be granted only if there is no genuine dispute as to an issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The district court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from the facts in that party's favor. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). The court will consider in turn whether the Defendant is entitled to judgment as a matter of law on Plaintiff's discriminatory firing and hostile environment claims.

A plaintiff may meet her burden of proof in a Title VII case in two ways. The first is by presenting evidence that sex was a determining factor in the employment decision. *See Equal Employment Opportu-*

**13.** Plaintiff argues that the information in Exhibits 8–20 was provided by the USPS in preparation for the administrative hearing and that the USPS "refused to provide the Plaintiff with copies of the employee information and/or documents during discovery." (Pl.'s Resp. Def.'s Mot. Strike at 3.) Plaintiff is referring, however, to discovery that took place for the EEOC hearing. Moreover, Plaintiff has not substantiated this claim by admissible testimony.

Plaintiff did not engage in any discovery, including requests for document production and interrogatories, for this action during the discovery period established by the court's Joint Rule 26(f) Report and Order of Approval, entered on January 3, 2000. Defendant's

counsel went so far as to agree to allow Plaintiff to take certain depositions *after* discovery had ended, and the court granted the parties' joint motion to allow Plaintiff to conduct the specified depositions on August 31, 2000. However, Plaintiff failed to seek an extension of discovery for document production or interrogatories.

**14.** The court was concerned enough about Plaintiff's counsel's knowledge of the Federal Rules of Evidence to hold a hearing on the matter on March 14, 2001. It is not necessary to summarize the contents of that discussion, but the court notes that a copy of the transcript of the hearing is in the file.

*nity Commission v. Northwest Structural Components, Inc.,* 822 F.Supp. 1218, 1220 (M.D.N.C.1993). If such evidence is not available, the plaintiff must rely on inferences and circumstantial evidence to prove her case under the *McDonnell Douglas* burden-shifting standard. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To survive summary judgment under this standard, a plaintiff first must establish a prima facie case of discrimination under Title VII.

■■■ To prove a prima facie case of discriminatory termination, Plaintiff must prove that (1) she is a member of a protected group; (2) she was qualified for her position, and her job performance was satisfactory; (3) Plaintiff was discharged in spite of her qualifications and performance; and (4) following her termination, the position remained open to similarly qualified applicants. *See Williams v. Cerberonics, Inc.,* 871 F.2d 452, 455 (4th Cir. 1989). To satisfy the fourth prong, Plaintiff may show that she was replaced by someone not in her protected class. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 186–87, 109 S.Ct. 2363, 2378, 105 L.Ed.2d 132 (1989).

Once a plaintiff has stated a prima facie case, the employer must provide a legitimate nondiscriminatory justification for its action. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Defendant alleges that Worster was fired because she made several death threats against a fellow postal employee in violation of the Joint Statement. Therefore, the burden shifts back to Plaintiff to prove that this justification is a mere pretext for an actual discriminatory motive. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507–508, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993).

■■■ Plaintiff is able to show the first and second prong of the prima facie case— she is a female, and a number of individu-

als testified in their depositions that she was a valued employee for many years and had a good work record. However, Plaintiff runs into a snare with regard to the third prong. While she had in the past performed satisfactorily, Worster's death threats were a clear violation of USPS and Greensboro District policies. Plaintiff herself testified that "[t]he [Joint Statement] says that—something to the effect that the post office and the union—I think they both signed off on it. It's something to the effect that they wouldn't tolerate any harassment and violence . . . and that anybody that engages in any violent acts could be subject to discipline up to removal." (Pl.'s Dep. at 62.) It is uncontested that Plaintiff told LaVere several times that she would kill him, which by her own admission subjected her to possible removal. Thus, Plaintiff has not proven a prima facie case of discriminatory firing.

■■■ Even if Worster had proven a prima facie case of discriminatory removal, Defendant has demonstrated a nondiscriminatory reason for firing Plaintiff—the zero tolerance policy. The Fourth Circuit has held that, to establish that an employer's justification is pretext for discrimination, a plaintiff must prove " 'both that the reason was false, and that discrimination was the real reason' for the challenged conduct." *DeJarnette v. Corning Inc.,* 133 F.3d 293, 298 (4th Cir.1998) (quoting *Jiminez v. Mary Washington Coll.,* 57 F.3d 369 (4th Cir.1995)); *see also Gillins v. Berkeley Elec. Coop., Inc.,* 148 F.3d 413 (4th Cir. 1998) (stating that "[t]his court has adopted what is best described as the 'pretext-plus' standard for summary judgment in employment discrimination cases").

Therefore, to defeat summary judgment Plaintiff must bring forth evidence upon which a reasonable jury could find by a preponderance of the evidence that Defendant's proffered reason—Worster's blatant violation of the zero tolerance policy—was false. *See Northwest Structural Components,* 822 F.Supp. at 1221 (finding that "[p]laintiff has evidence that directly con-

tradicts Defendant's reason for not rehiring her and all the other evidence pertaining to the disputed facts suggests pretext as well"). Worster must also bring forth evidence showing that the Defendant's real reason for not promoting her was discriminatory.

Worster has failed to produce any evidence by which a jury could find either that Defendant's nondiscriminatory reason for firing her was false or that the real reason was discriminatory. Nelson, the supervisor on duty when the August 3 incident occurred, testified that "I believed that [Worster should be fired after] [s]topping and thinking and realizing how serious it [making death threats] was and that there had been warnings that this kind of behavior would not be tolerated." (Nelson Dep. at 27.) Nelson indicated his reluctance to follow policy, because "that's hard to admit or to come around to taking action against someone that you care about as a friend and a long acquaintance." (*Id.*)

David Williams (Williams), the station manager who was the concurring official on Nelson's recommendation of removal, testified that "[i]t wasn't my responsibility to decide whether she would actually kill the man or not kill the man. My responsibility was to take action on that she threatened to kill him." (Williams Dep. at 17.) When asked whether Williams actually believed that Worster meant what she threatened, he stated, "That's not for me to determine. She stated she was going to kill somebody. I couldn't really tell you whether she really meant that she would do it or not." (*Id.*)

There is no dispute over what Plaintiff said, the existence of a zero-tolerance policy for such violent threats, or the fact that removal was a possible punishment. Plaintiff has offered no evidence that the decision to fire her was made on any other basis, besides her own opinion. Worster must do more than rely on her own opinion. *See DeJarnette*, 133 F.3d at 299 (stating that, "[w]ith respect to opinion testimony, we have repeatedly explained that it is

the perception of the decision maker which is relevant, not the self-assessment of the plaintiff") (citations omitted). The court notes that the exhibits that were stricken did not show that the reason given for Worster's firing was false.

Because Worster has failed to produce any evidence by which a reasonable jury could find that Defendant's legitimate, nondiscriminatory reason for firing Plaintiff was either false or the pretext for a discriminatory reason, this court will grant Defendant's motion for summary judgment as to Plaintiff's discriminatory firing claim.

■ It is unclear whether Plaintiff's complaint stated a claim for discriminatory firing or discriminatory treatment, so the court will examine both. Turning now to Plaintiff's claim that male employees who committed similar workplace violations were given lesser penalties because of their gender, a prima facie case of sex discrimination in the application of employee discipline under Title VII requires a showing that: (1) Plaintiff is a member of a protected class; (2) the prohibited conduct in which she was engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) the disciplinary measures enforced against her were more severe than those enforced against other employees. *See Cook v. CSX Transportation Corp.*, 988 F.2d 507, 511 (4th Cir.1993). The *McDonnell Douglas* burden-shifting standard would apply to this claim, as well.

The Fourth Circuit has held that summary judgment for the employer is proper under a discriminatory enforcement claim where the plaintiff has not proffered sufficient evidence that similarly situated non-minority employees (males, in this case) were treated more favorably. *See id.* at 512. The *Cook* court stated that "only discipline imposed for like offenses" should be considered at the burden-shifting stage. *Id.* at 511.

Plaintiff's only evidence comes from her deposition testimony, in which she de-

scribed allegedly similar violations of which she had learned.[15] However, Plaintiff had no firsthand knowledge of such violations. Worster testified that she "didn't know [any males who made a threat to kill someone and were treated differently in their punishment] personally." (Pl.'s Dep. at 60.) Instead, Worster relies on information gathered in preparation for the hearing before the EEOC administrative law judge, none of which has been authenticated and is therefore inadmissible. Thus, Plaintiff has not shown that male employees who committed similar workplace violations were treated more favorably. In conclusion, Worster has failed to establish a prima facie case of discrimination based on different disciplinary action taken against her and male employees.

■ Finally, Plaintiff alleges that she was subject to hostile environment discrimination. To sustain a claim of hostile work environment under Title VII, Plaintiff must show that (1) she belonged to a protected class; (2) the conduct in question was unwelcome; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer either knew or should have known of the harassment and failed to take prompt remedial action. *See Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir.1989). Any harassment that Worster suffered clearly was based on her anti-union beliefs, not her gender. Plaintiff has submitted no evidence relating to gender-based harassment.[16] As unpleasant as Plaintiff's relationships with co-workers may have been, the fact that she was harassed for her views and happened to be a woman does not turn the alleged harassment into a discrimination claim. Therefore, Plaintiff has failed to state a claim for hostile environment.

## III. CONCLUSION

For the reasons discussed herein, the court will grant Defendant's motion to strike Plaintiff's Exhibits 4–5, 7–20, and 22. Further, the court will grant Defendant's motion for summary judgment on Plaintiff's Title VII claims.[17]

---

**15.** Plaintiff attempted to introduce, in addition to the exhibits that have been stricken, evidence of disparate punishment through her depositions of Williams and Nelson, the two individuals who decided to fire Worster. However, both testified that they were not aware of any similar violations instigated by male employees. Nelson stated that "I don't recall any comparative situations.... I'm not aware of any situations like that [where male employees were not discharged after making death threats]." (Nelson Dep. at 36, 48.) Williams testified that "I haven't had any male employees threaten to kill anybody under my jurisdiction." (Williams Dep. at 29.)

**16.** Further, she has not alleged that she ever complained to management about harassment she received even for her pro-management views, so Plaintiff cannot show that Defendant failed to take remedial action. The crucial fact remains, however, that Worster never alleged that she was harassed because of her gender.

**17.** Following the completion of this memorandum opinion but before it was actually filed, Plaintiff untimely and without authorization filed an additional brief in opposition to summary judgment. Nevertheless, the court has reviewed this new filing and finds it to be heavy in volume and light in impact. The court finds no reason to recall or modify this opinion.