Charlotte W. DISHER, Plaintiff,

v.

Wilson S. WEAVER, II, Terry R. Jones, Patricia D. Norris, Linda G. Davis, Thomas W. Fredericks, Bryce A. Stuart, in their official and individual capacities, and the City of Winston–Salem, Defendants.

No. 1:02 CV 00529.

United States District Court, M.D. North Carolina.

Feb. 26, 2004.

William L. Hill, Matthew L. Mason, Moss Mason & Hill, Greensboro, NC, for Plaintiff.

Gusti W. Frankel, Lucretia D. Guia, Alison Raney Bost, Womble Carlyle Sandridge & Rice, Winston–Salem, NC, for Defendant.

*MEMORANDUM OPINION and ORDER*

OSTEEN, District Judge.

Plaintiff Charlotte W. Disher, a white female, has filed suit against Defendants Wilson S. Weaver, II, Terry R. Jones, Patricia D. Norris, Linda G. Davis, Thomas W. Fredericks, Bryce A. Stuart, and the City of Winston–Salem, North Carolina. Disher claims that Defendants' actions in terminating her employment deprived her of procedural and substantive due process and equal protection of laws, as secured by the Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983 (" § 1983"), and Article I, section 19 of the North Carolina Constitution. Plaintiff additionally alleges that her termination was the result of illegal discrimination on the basis of race, in violation of 42 U.S.C. § 1981 (" § 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Plaintiff also asserts a state common law claim of wrongful termination. This matter is now before the court on Defendants' motion for summary judgment as to all of Plaintiff's claims and Plaintiff's motion to strike Defendants' suggestion of subsequently decided authority.

I. BACKGROUND

The following facts are stated in the light most favorable to Plaintiff.

On April 24, 2001, Plaintiff, a Senior Police Officer for the Winston–Salem Police Department, and a trainee, Officer Loumay Miller, received a call reporting a disturbance at 2308 Okalina Avenue. At that address, which was a private residence, Plaintiff encountered Angela Melton engaged in a dispute with Deborah Bethea, an occupant of the home. The dispute regarded child care for Ms. Melton's baby, also the child of Ms. Bethea's son Rashon. Ms. Melton informed the officers that Rashon, whom she believed was inside the house, had an outstanding warrant based on a prior altercation in which he threatened to kill her while beating her head against concrete.

Plaintiff had observed two black males inside the house earlier and believed that one of them was Rashon, based on a description given by Ms. Melton. By radio, Plaintiff confirmed an active warrant against Rashon for communicating threats and assaulting a female. Plaintiff called for backup, directing one of the responding officers, Officer Jorge Alamillo, to retrieve the warrant and telling two others, Officers Edward Haire and Frank Clayton, to watch the back door of the home.

When Officer Alamillo radioed to inform Plaintiff that he had the warrant in-hand, Plaintiff and Officer Miller went to the porch of the residence and informed Ms. Bethea that a warrant for Rashon was on the way. Ms. Bethea denied that Rashon was inside and refused to allow them entry until the warrant arrived. During the discussion, Plaintiff stood with her foot on the threshold so that the front door was partially open and the screen door was at her back. Plaintiff claims she had consent to remain in that position with her foot inside the front door while waiting for the warrant. Ms. Bethea closed the door as far as she could and retreated inside the residence.

At that point, Plaintiff observed an older black male walking up the driveway. This man, later identified as Cleveland Bethea, father of Ms. Bethea and grandfather of Rashon, entered the residence through the back door. Mr. Bethea came to the front door, saw Plaintiff standing on the porch, and attempted to close the door. Plaintiff still had her foot in the door, and advised Mr. Bethea to stop closing it.[1] Mr. Bethea responded to this request by insinuating that he had a weapon and continuing to close the door. Plaintiff claims to have seen bulges in Mr. Bethea's pockets and reached out to frisk him for weapons. As she moved toward him, Mr. Bethea re-

acted by grabbing Plaintiff's neck and choking her.

As Plaintiff and Mr. Bethea struggled they moved into the house. Officer Miller, still on the porch, did not assist Plaintiff so Ms. Melton ran to the back of the home and informed Officers Haire and Clayton that Plaintiff was being assaulted. Haire and Clayton ran around the side of the home, through the front door, and into the living room where they found Mr. Bethea still choking Plaintiff. Haire and Clayton each grabbed one of Mr. Bethea's arms and tried to restrain him. Plaintiff then pepper-sprayed Mr. Bethea in each eye, aiming around his glasses to do so.

It is unclear whether Mr. Bethea was still struggling with the officers when he was pepper-sprayed; it is also unclear from what distance he was sprayed. After being sprayed, Mr. Bethea broke free of the officers and ran to the bathroom where he rinsed his eyes with water. When he emerged he was arrested for resisting, delaying, or obstructing a government official in the performance of her duties. These charges were later dropped. Rashon Bethea was not found inside the house.

Later that day, Plaintiff's immediate supervisor, Sergeant Howard Brown initiated an investigation, interviewing Plaintiff, Officer Miller, and Deborah and Cleveland Bethea. Sergeant Brown reported his findings to Defendant Lieutenant Wilson Weaver who, in turn, referred the incident to the Professional Standards Division ("the PSD") for formal investigation. During this investigation, several of the officers who witnessed the incident were interviewed and indicated that the operation was handled inappropriately.

---

1. Accounts of Plaintiff's actual statement vary, ranging from a polite request to stop to a veiled threat to shoot Mr. Bethea if he did not desist.

On May 10, 2001, the PSD concluded the investigation, finding that violations should be sustained against Plaintiff for improper arrest, search, and seizure, improper use of force, conduct unbecoming, and unsatisfactory performance. The PSD, pursuant to their policy, did not recommend any specific form of discipline. Plaintiff's chain of command, including Defendants Captain Terry Jones and Assistant Chief Patricia Norris determined that Plaintiff should be terminated. On May 14, 2001, Defendant Norris informed Plaintiff of this decision and provided a copy of the Disciplinary Action Report which indicated Plaintiff's violation of Rule of Conduct 24, "Unsatisfactory Performance."

Plaintiff decided to appeal her termination through the police department grievance procedures. The first appeal consisted of a hearing before Defendant Chief Linda Davis, at which Plaintiff was represented by counsel. Defendant Davis upheld the termination. Plaintiff then appealed to Defendant City Manager Bryce Stuart. Defendant Stuart designated Defendant Assistant City Manager Thomas Fredericks to conduct the hearing. Plaintiff attended the hearing and testified. She was again represented by counsel, who was permitted to put on evidence, call witnesses, and cross examine opposing witnesses. At the close of the hearing, Defendant Fredericks reviewed the evidence and recommended that Plaintiff's termination be upheld because (1) Plaintiff was required to have a warrant in hand or consent before entering the residence, (2) Plaintiff failed to follow police procedure by leaving her foot in the door and escalated the situation, (3) Plaintiff was unprofessional and used inappropriate language during the altercation, and (4) Plaintiff failed to follow departmental policy when she pepper-sprayed Mr. Bethea. Defendant Stuart reviewed Defendant Frederick's report on the hearing and agreed that Plaintiff's termination should stand. On November 27, 2001, Defendant Stuart sent a letter to Plaintiff informing her of his decision.

Plaintiff filed a charge with the Equal Employment Opportunity Commission, claiming that the black officers in her chain of command discriminated against her on the basis of race. On April 2, 2002, Plaintiff received her right-to-sue letter from the Commission. (Compl.¶14.) On June 28, 2002, she filed suit against several of her commanding officers, Defendants Weaver, Jones, Norris, and Davis, the city officials who upheld her termination, Defendants Fredericks and Stuart, and the City of Winston–Salem ("the City"). Weaver, Jones, and Norris are black; Davis, Fredericks, and Stuart are white.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates that there is no genuine issue of material fact, thus entitling the moving party to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the moving party has met that burden, the nonmoving party must then persuade the court that a genuine issue does remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). However, there must be more than just a factual dispute; the fact in question must be material and the dispute must be genuine. *See* Fed R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Although the court must view the facts in the light most favorable to the nonmovant, *see Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513, "bare allega-

tions unsupported by legally competent evidence do not give rise to a genuine dispute of material fact." *Solis v. Prince George's County,* 153 F.Supp.2d 793, 807 (D.Md.2001). Summary judgment should be granted unless a reasonable jury could return a verdict in favor of the nonmovant on the evidence presented. *McLean v. Patten Cmtys., Inc.,* 332 F.3d 714, 719 (4th Cir.2003) (citing *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10).

### A. Plaintiff's Claims under § 1981 and Title VII

■ Plaintiff alleges that Defendants' decision to terminate her employment was based on race in violation of § 1981 and Title VII. In order to establish a prima facie case of racial discrimination in the enforcement of disciplinary measures, the parties agree that Plaintiff must show (1) she is a member of a protected class, (2) the prohibited conduct she engaged in was comparable to the misconduct of employees outside the protected class, and (3) the disciplinary measures enforced against her were more severe than those enforced against employees outside the protected class.[2] *Cook v. CSX Transp. Corp.,* 988 F.2d 507, 511 (4th Cir.1993). In order to make out her prima facie case as set forth in *Cook,* "Plaintiff must establish that similarly situated employees who are not in [her] protected class were not similarly disciplined for like offenses." *Morrow v. Farrell,* 187 F.Supp.2d 548, 554 (D.Md. 2002), *aff'd per curiam,* No. 02–1342, 2002 WL 31545993 (4th Cir. Nov.18, 2002) (citing *Moore v. City of Charlotte,* 754 F.2d 1100, 1107–11 (4th Cir.1985)). In determining whether employees are similarly situated, "relevant factors include whether the employees were subject to the same standards, and whether they engaged in similar conduct without mitigating circumstances that would differentiate their conduct from that of other employees." *Truesdale v. Potter,* No. 1:01CV00427, 2003 WL 1522945, at *5 (M.D.N.C. Mar.24, 2003).

■ Defendants do not dispute that Plaintiff is a member of a protected class, or that black officers have been disciplined less severely. Defendants attempt to refute only the second required element, arguing that Plaintiff cannot show any "similarly situated" black officers receiving more favorable discipline.

Plaintiff has described several black officers that engaged in misconduct and who were not fired. For example, Plaintiff asserts that Officer Jamal Pete, a black male of the same rank as Plaintiff, was suspended and demoted rather than terminated after being criminally charged for assaulting a handcuffed suspect. Likewise, Defendant Weaver, also a black male, received only disciplinary counseling after he shot an unarmed teenager in the jaw and shoulder at point blank range. Weaver apparently feared that the teenager, who had stolen a car, was about to pull out and drag Weaver, who was reaching into the car to turn off the ignition. Perhaps most similar to Plaintiff's situation, Defendant Jones pepper-sprayed a female suspect, allegedly because the suspect insulted him. He received no disciplinary treatment.

Defendants assert that each of the officers Plaintiff describes can be distinguished from Plaintiff on some ground. For example, Defendants frequently state that other officers were not similarly situated to Plaintiff because they did not share a common supervisor. Defendants cite *Radue v. Kimberly–Clark Corp.,* 219 F.3d

---

2. The required elements of a prima facie case of employment discrimination are the same under Title VII and § 1981. *Bryant v. Bell Atl. Md., Inc.,* 288 F.3d 124, 133 n. 7 (4th Cir.2002); *Gairola v. Commonwealth of Va. Dep't of Gen. Servs.,* 753 F.2d 1281, 1285 (4th Cir.1985).

612, 619 (7th Cir.2000) to support this proposition. However, the *Radue* court found that "[i]n determining whether two employees are similarly situated a court must look at all relevant factors, the number of which depends on the context of the case." *Id.* at 617. As such, the lack of a common supervisor does not necessarily undermine Plaintiff's prima facie case. Furthermore, Defendants do not dispute that several of the officers discussed did share a common supervisor with Plaintiff. As to those officers, Defendants instead rely on their assertions that these officers were not in command of the operation in which the misconduct occurred (Officer Pete), were at risk of bodily harm (Captain Weaver), or were engaged in lawful conduct (Captain Weaver). Although Officer Pete was not in charge of the operation during which he twice assaulted a handcuffed suspect, it is not clear that his conduct (hitting the man once after he ran away, and again after he was returned to the police van) was mitigated because he was not in command of the entire operation. Since questions of fact remain as to whether Plaintiff was at risk of bodily injury, and whether she violated police procedure during the incident, these grounds are also insufficient to distinguish her conduct at this stage. Finally, Defendants point out that, unlike the black officers, Plaintiff created the problem that led to her termination. This argument overlooks both the questions of fact regarding Plaintiff's actual fault during the incident and Defendants' admission that Defendant Weaver received disciplinary counseling because "he placed himself in jeopardy . . . by reaching into the car." (Davis Dep. at 148.)

Though Defendants discuss some additional but less persuasive grounds on which to differentiate Plaintiff and each of the black officers mentioned, these distinguishing factors are not dispositive to Plaintiff's establishment of a prima facie case. The Fourth Circuit has not held that any one of these differences alone can undermine a plaintiff's discrimination claim at the summary judgment stage. In fact, the court has said that all police officers in a given department must be considered similarly situated when courts consider alleged race-based distinctions "in matters such as assignments, promotions, and salary levels." *Williams v. Hansen,* 326 F.3d 569, 576 (4th Cir.2003). The court has also recognized that, although it is necessary to "compare only discipline imposed for like offenses in sorting out claims of disparate discipline under Title VII . . . the reality [is] that the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." *Cook,* 988 F.2d at 511.

Whether the distinguishing characteristics advanced by Defendants sufficiently rebut Plaintiff's assertion of race discrimination involve questions of fact and credibility more appropriately weighed by a jury. The differences addressed are not sufficient for the court to conclude as a matter of law that none of the black officers were similarly situated to Plaintiff.

In that regard, the most relevant consideration is whether the misconduct engaged in is similar enough to be comparable to Plaintiff's actions. Unlike the other distinguishing factors Defendants mention, this requirement is actually imposed as part of the prima facie case. *See id.* (finding that employees were similarly situated within the meaning of the prima facie case requirement when they "had engaged in conduct of 'comparable seriousness' to that of [the plaintiff]"). Here, Plaintiff has pointed to black officers engaging in misconduct that ranges from the falsification of time cards to the point blank shooting of an unarmed teenager. Although it is true that not all of these incidents can be considered similar to Plaintiff's alleged mis-

deed, several of the officers did engage in conduct of comparable severity and were not fired. Most notably, Plaintiff points to several officers whose misconduct caused bodily harm to the public. This result, which was also caused by Plaintiff's actions, indicates that at least some of the black officers were engaged in conduct of similar severity to Plaintiff's.[3] Since none of these officers received discipline comparable to termination, this court concludes that Plaintiff has successfully demonstrated a prima facie case of disparate discipline based on race.

█ Under the framework formerly applicable to Title VII and § 1981 cases, Defendants would be afforded an opportunity to rebut Plaintiff's prima facie case by showing a legitimate, non-discriminatory reason for firing Plaintiff. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 (4th Cir.2002). Defendants contend that Plaintiff was fired because

"she violated state law and departmental policy and procedures in her handling of the [incident]." (Defs.' Br. Supp. Mot. Summ. J. at 16.) Plaintiff disputes that such a violation occurred.

Assuming Defendants are correct in asserting that Plaintiff violated state law and police procedure, their showing is insufficient to refute Plaintiff's claim that race may have been one of several motivating factors for her termination. Following Congress' 1991 amendment to Title VII, plaintiffs may now demonstrate impermissible race discrimination by showing that "race ... was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m);[4] *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 2155, 156 L.Ed.2d 84 (2003) (holding that the statute does not require plaintiffs to put forth direct evidence of discrimination in order to obtain a "motivating factor" or "mixed motive" jury instruction).[5]

**3.** The court will more thoroughly address whether each individual officer is sufficiently comparable to Plaintiff in its ruling on Defendants' motion in limine to exclude all evidence of these other incidents. At this stage, it is sufficient to note that at least some of the officers were similarly situated to Plaintiff and did receive more lenient discipline. That showing indicates that evidence regarding those officers should properly be within the consideration of the jury.

**4.** Although Congress amended only Title VII and not § 1981, this court will continue to treat claims under each statute as analogous. Courts have analyzed Title VII and § 1981 claims under the same framework since *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), even though the mixed motives amendment was made to Title VII alone. *See, e.g., Love–Lane v. Martin*, 355 F.3d at 786 (4th Cir.2004). The Fourth Circuit and this court have also applied the Title VII mixed motive standard to the Age Discrimination in Employment Act. *See Hill v. Lockheed Martin Logistics Mgmt.,*

*Inc.*, 354 F.3d 277, 284 (4th Cir.2004) (en banc); *Rishel v. Nationwide Mut. Ins. Co.*, 297 F.Supp.2d 854, 865 n. 3 (M.D.N.C.2003).

**5.** Defendants' argument with respect to Plaintiff's discrimination claims is aimed only at the traditional *McDonnell Douglas* pretext analysis. In response to Plaintiff's mixed motive claim, Defendants simply argue that a mixed motive analysis is only applicable at the jury instruction stage. (Defs.' Reply Br. Supp. Mot. Summ. J. at 8 n. 8.) Although *Desert Palace* was decided in the context of a case at the jury instruction stage, Defendants' assertion overlooks the fact that the standard applied in *Desert Palace* is identical to the general summary judgment standard. *Compare Desert Palace*, 123 S.Ct. at 2155 (concluding that, to obtain a mixed motive jury instruction, plaintiffs "need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race ... was a motivating factor for any employment practice"), *with Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986) (a motion

Plaintiffs may now assert that race was simply one motive for Defendants' unequal application of discipline. To proceed under this "mixed motive" theory, plaintiffs "need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" *Id.* (quoting 42 U.S.C. § 2000e–2(m)). Under this framework, summary judgment cannot be granted if Plaintiff demonstrates, by direct or circumstantial evidence, that race may have been one motivating factor in Defendants' decision to terminate her. The evidence need only be probative enough for a jury to conclude by a preponderance of the evidence that Plaintiff is correct in her assertion. *Id.*

Although Defendants argue that they had a legitimate reason to fire Plaintiff, namely her alleged failure to follow police procedure, the existence of a lawful reason to terminate employment does not wholly rebut the allegation of mixed motive firing. If Plaintiff had asserted that race was the only reason for her termination under the familiar *McDonnell Douglas* framework, Defendants' assertion would adequately rebut her claim. However, to defeat Plaintiff's mixed motive allegation, Defendants must demonstrate that *only* legitimate reasons contributed to Plaintiff's firing. That Defendants may have shown one legitimate reason to fire Plaintiff does little to prove that race did not contribute to her termination. Even if Defendants put forth several legitimate reasons to fire Plaintiff, this showing would still not negate the possibility that race also played a role in their decision.[6]

Further, Defendants do not dispute that several of the black officers receiving allegedly favorable treatment also violated police procedure. That a legitimate reason for firing those officers did not, in fact, result in their termination raises a reasonable question as to whether race, as an additional factor, contributed to Plaintiff's firing. Although Defendants have pointed out circumstances besides race that further differentiate Plaintiff's situation (e.g., relative experience, acceptance of blame, and past disciplinary history), under the mixed motive framework this court simply cannot conclude as a matter of law that race played no role in Defendants' decision. The misconduct by black officers

for summary judgment is defeated when the plaintiff has presented evidence "such that a reasonable jury could return a verdict for the [plaintiff]"); *see also Rishel,* 297 F.Supp.2d at 865 ("This 'reasonable jury' standard [set forth in *Desert Palace* ] is precisely the same as the standard for defeating a motion for summary judgment."); *Dunbar v. Pepsi–Cola Gen. Bottlers of Iowa, Inc.,* 285 F.Supp.2d 1180, 1195 (N.D.Iowa 2003) (also finding the "reasonable jury" standard is applicable to decisions involving either mixed motive jury instructions or summary judgment motions). As such, Defendants have wrongly concluded that the mixed motive analysis is inapplicable at the summary judgment stage.

6. Defendants argue that "[i]n order to prevent summary judgment for defendants, plaintiff must establish that but for racial discrimination, defendants would not have terminated her." (Defs.' Br. Supp. Mot. Summ. J. at 17.) This conclusion is erroneous in light of Title VII's provision that a defendant will be fully liable if race played any motivating role in the adverse employment action. *See* 42 U.S.C. § 2000e–2(m). In fact, if Plaintiff can prove that race was a motivating factor in the decision, Defendants will not escape liability even if they can show that their decision would have been the same regardless of race. *See id.* § 2000e–5(g)(2)(B). With that showing, Defendants will avoid only damages and certain types of injunctive relief, but will still be liable for attorneys' fees, costs, declaratory relief, and other forms of injunctive relief. *See id.* § 2000e–5(g)(2)(B)(i), (g)(2)(B)(ii). This provision of Title VII indicates that race does not, as Defendants assert, have to be the "but for" cause of Plaintiff's termination in order for Plaintiff to recover.

who were not fired is similar enough to Plaintiff's alleged wrongdoing that a reasonable jury could find by a preponderance of the evidence that race was a motivating factor in Plaintiff's discharge.

██ Since a genuine issue of material fact exists as to whether race played any role in Defendants' decision to terminate Plaintiff, the court will deny Defendants' motion for summary judgment as to Plaintiff's § 1981 and Title VII claims against the City. However, as Defendants rightly point out, individual employees and supervisors cannot be liable under these statutes. *See Lissau v. Southern Food Serv., Inc.*, 159 F.3d 177, 180 (4th Cir.1998) (holding that Title VII does not apply to individual employees or supervisors, in part because "Title VII exempts small employers; it would be incongruous to hold that Title VII does not apply to the owner of a five-person company but applies with full force to a person who supervises an identical number of employees in a larger company"). Therefore, summary judgment will be granted as to Plaintiff's § 1981 and Title VII claims against each individual defendant.

B. Plaintiff's Alleged Deprivation of Rights Guaranteed by the United States and North Carolina Constitutions

Plaintiff claims that Defendants' decision to terminate her employment deprived her of procedural and substantive due process and equal protection, as guaranteed by both the United States and North Carolina Constitutions. U.S. Const. amend. XIV, § 1; N.C. Const. art. I, § 19. The applicable provision of the North Carolina Constitution is known as "the law of the land

clause." North Carolina courts have consistently interpreted this clause to be synonymous with the provisions of the Fourteenth Amendment of the United States Constitution, finding that equivalent rights and protections are provided by each source. *See Bacon v. Lee*, 353 N.C. 696, 719 n. 11, 720–21, 549 S.E.2d 840, 856 n. 11, 856–57 (2001) (stating that due process and equal protection challenges under the North Carolina Constitution are resolved by applying "the same test used by federal courts under the parallel clause in the United States Constitution"); *Department of Transp. v. Rowe*, 353 N.C. 671, 675, 549 S.E.2d 203, 207 (2001) (noting that North Carolina courts employ the same test when considering alleged deprivations of equal protection under either the state or United States Constitution); *In re Moore's Sterilization*, 289 N.C. 95, 98–105, 221 S.E.2d 307, 309–14 (1976) (treating alleged deprivations of due process and equal protection under state and federal Constitutions with the same framework applied by federal courts). As such, this court will consider Plaintiff's rights under both Constitutions to be equivalent and will consider alleged deprivations of those rights under the same analysis.

1. Alleged Deprivations of Due Process

██ The right to due process of laws is enforced to protect an individual's life, liberty, and property interests. *See* U.S. Const. amend XIV, § 1. As such, Plaintiff must demonstrate a property interest in her employment to succeed on either a procedural or substantive due process claim.[7] *Tri–County Paving, Inc. v. Ashe County*, 281 F.3d 430, 436, 440 (4th Cir. 2002); *Sylvia Dev. Corp. v. Calvert Coun-*

---

7. Civil rights plaintiffs sometimes assert that adverse employment actions deprive them of due process with respect to liberty, rather than property, interests by claiming that the employment action injured their reputation.

*See, e.g., Jackson v. Long*, 102 F.3d 722, 730 (4th Cir.1996). Since Plaintiff has not advanced this argument, the court will not consider it further.

*ty, Md.,* 48 F.3d 810, 826–27 (4th Cir.1995); *Pittman v. Wilson County,* 839 F.2d 225, 226–27 (4th Cir.1988) (citing *Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972)). Here, Plaintiff argues that she had a reasonable expectation of continued employment, such that her termination deprived her of the "property interest" she held in her job. In order to possess a property interest in her continued employment, Plaintiff must show that she held "a legitimate claim of entitlement to it." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. The sufficiency of her claim of entitlement "must be decided by reference to state law." *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976).

■■■■ Under North Carolina law, "absent some form of contractual agreement between an employer and employee establishing a *definite* period of employment, the employment is presumed to be an 'at-will' employment, terminable at the will of either party, irrespective of the quality of performance by the other party." *Harris v. Duke Power Co.,* 319 N.C. 627, 629, 356 S.E.2d 357, 359 (1987), *overruled on other grounds by Kurtzman v. Applied Analytical Indus., Inc.,* 347 N.C. 329, 333, 493 S.E.2d 420, 423 (1997); *see also Presnell v. Pell,* 298 N.C. 715, 723–24, 260 S.E.2d 611, 616 (1979) ("Nothing else appearing, an employment contract in North Carolina is terminable at the will of either party."). The "employee-at-will" presumption is only rebutted by an express or implied contract guaranteeing employment for a specific duration, or, alternatively, a statute or ordinance providing specific restrictions on an employee's discharge. *See Pittman,* 839 F.2d at 226 (holding that a dismissal did not violate the due process rights of an employee "because, under long settled North Carolina law, she was merely an 'at-will' employee without any contractual or statutory guar-antees of continued employment"); *Presnell,* 298 N.C. at 723, 260 S.E.2d at 616.

■■■■ Plaintiff argues that the City's charter and ordinances provide a fixed term of employment and certain procedures for discharge. Plaintiff asserts that these sources indicate she had a property interest in her job. Although there is some authority to support this position, *see Young v. Annarino,* 123 F.Supp.2d 915, 924 (W.D.N.C.2000), as Defendants correctly point out, the relevant provisions of the City's charter have been superceded. By later ordinance, the City adopted a city manager form of government, as authorized by North Carolina statute. *See* N.C. Gen.Stat. § 160A–101(9)(b); Winston–Salem, N.C., Ordinances § 2–317. The authorizing statute expressly provides that any city choosing to operate under this form of government may do so "in accordance with [state law] and any charter provisions not in conflict therewith." N.C. Gen.Stat. § 160A–101(9)(b). In choosing the city manager form of government, the City also chose to supercede the conflicting provisions of its charter which are now cited by Plaintiff as controlling. Although the charter provisions cited by Plaintiff indicate certain procedures for the city council to terminate city employees, the superceding laws provide that the city manager, rather than the city council, is vested with the power to "remove all employees of the city." Winston–Salem, N.C., Ordinances, Related Laws, art. I, § 5; *see also,* N.C. Gen.Stat. § 160A–148(1) (providing that city managers "shall appoint and suspend or remove all city officers and employees not elected by the people"). These controlling laws do not provide a fixed term of employment or termination procedures for police officers, stating only that "employees of the city . . . shall perform such duties as may be required of them by the city manager."

Winston–Salem, N.C. Ordinances, Related Laws, art. I, § 5.

These provisions supplant the authority Plaintiff cites in support of her claimed property interest. *See* N.C. Gen.Stat. § 160A–101(9)(b) (conferring on the City the power to adopt a city manager form of government); *id.* § 160A–3(c) (providing that any power or function conferred on a city by "general law" will supercede any contradictory provision appearing in an earlier-enacted charter); *id.* § 160A–1(4) (defining "general law" to include North Carolina's General Statutes). Since later, binding authority provides no definite term of employment and no set procedure for termination, Plaintiff has not, on this ground, rebutted the strong presumption that she was an "at-will" employee.

█ Plaintiff next argues that, although she did not enter into an express employment contract, she maintained a "reasonable expectation of continued employment" and, therefore, a property interest in her job because Defendants made certain representations to her that created an implied contract of employment. Even assuming that some of the individual Defendants made such representations to Plaintiff, these statements do not actually alter Plaintiff's status unless the individuals had the ultimate authority to fire her. *McCallum v. North Carolina Coop. Extension Serv. of N.C. State Univ.*, 142 N.C.App. 48, 59, 542 S.E.2d 227, 236 (2001). Plaintiff has produced no evidence to show that either the city manager or the City ratified the statements alleged to have been made by Plaintiff's supervisors. Without this showing, Plaintiff must be considered an at-will employee. *See Woods v. City of Wilmington*, 125 N.C.App. 226, 233, 480 S.E.2d 429, 433–34 (1997).

Since Plaintiff held no property interest in her job, her termination did not deprive her of procedural or substantive due process in violation of either the North Carolina or United States Constitutions. *See Tri–County Paving*, 281 F.3d at 436, 440 (stating that, to demonstrate a denial of procedural or substantive due process, a plaintiff must show a deprivation of "property or a property interest"); *Sylvia Dev. Corp.*, 48 F.3d at 826–27 (same).[8] Having concluded as a matter of law that Plaintiff did not have a property interest in her continued employment, the court will grant Defendants' motion for summary judgment as to all of Plaintiff's due process claims.

2. Alleged Deprivations of Equal Protection

█ Plaintiff claims that Defendants' decision to terminate her employment was based on race and, therefore, deprived her of equal protection. *See* U.S. Const. amend. XIV, § 1; N.C. Const. art. I, § 19. An equal protection claim based on alleged employment discrimination is analyzed under standards developed for litigation under Title VII and § 1981. *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir.

**8.** The Fourth Circuit has already determined that a Winston–Salem police officer, employed for a longer period than Plaintiff and governed by the same policies and laws, did not have a property interest in his employment, and so could not succeed on a due process claim. *Daulton v. City of Winston–Salem*, No. 87–2637, 1988 WL 54034, at *2 (4th Cir. May 24, 1988).

[T]he controlling state statute and city ordinance make unmistakably clear that appel-

lant was an at-will employee.... The terms of the police department manual and rules of conduct are insufficient to overcome the presumption of at-will employment embodied in the local ordinance and the state's common law. Therefore, appellant did not have a constitutionally protected property interest in continued employment as a detective with the Winston–Salem police department.

*Id.*

1994); *Boutros v. Canton Reg'l Transit Auth.*, 997 F.2d 198, 202–03 (6th Cir.1993); *Trautvetter v. Quick*, 916 F.2d 1140, 1149 (7th Cir.1990).[9]

 Plaintiff has raised questions of fact regarding race as a motivating factor in Defendants' decision to terminate her. She has done so primarily by asserting that similarly situated black officers were treated more favorably in disciplinary matters. "The Equal Protection Clause of the Fourteenth Amendment ... is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313. In the context of an equal protection claim, the Fourth Circuit has stated that all police officers in a given department are similarly situated. *See Williams v. Hansen*, 326 F.3d 569, 576 (4th Cir.2003). As such, any distinction in disciplinary treatment made on the basis of race will be subject to strict scrutiny. *See id.* ("[F]or most purposes officers in a police department must be regarded as similarly situated regardless of their race. Thus, in matters such as assignments, promotions, and salary levels a race-based distinction among officers would be subject to strict scrutiny in an equal protection analysis."). Having already determined that Plaintiff raised questions of fact regarding the reasons for her termination, the court also finds that Plaintiff has demonstrated a genuine issue as to whether race-based distinctions contributed to disparate discipline.

Since a question of fact remains regarding alleged racial classification in officer discipline, Defendants are only entitled to summary judgment by showing that such distinctions, if made, were permissible because they withstand strict scrutiny. De-

fendants, however, cannot (and do not attempt to) demonstrate a compelling reason for any racially disparate discipline that may have occurred. *See Abrams v. Johnson*, 521 U.S. 74, 92, 117 S.Ct. 1925, 1936, 138 L.Ed.2d 285 (1997); *Shaw v. Hunt*, 517 U.S. 899, 908, 116 S.Ct. 1894, 1902, 135 L.Ed.2d 207 (1996); *see also Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979) ("A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification."). As such, Plaintiff's showing of continued issues of material fact as to whether race was a factor in disciplinary decisions entitles her to a jury trial on her equal protection claims.

 Defendants argue that Plaintiff's federal equal protection claim, asserted through § 1983, fails because she has not alleged that the City maintains a policy or custom of intentional race discrimination. Further, Defendants argue that the act complained of was not taken by "an individual with final policymaking authority." (Defs.' Br. Supp. Mot. Summ. J. at 19.) Although an allegation of policy or custom is required to support municipal liability under § 1983, *see Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978), Plaintiff adequately made such an assertion in her complaint, stating, "[s]uch conduct is part of a pattern and practice on the part of Defendants to deprive employees of a meaningful grievance process ... due to ... illegitimate considerations such as race." (Compl. ¶ 42; *see also id.* ¶ 43.) The act complained of, Plaintiff's termination, was approved by the city manager who is the official vested with final decision-making authority for the

---

9. Plaintiff submits no further facts or arguments in support of her § 1983 equal protection claim, relying instead on those put forth in support of her § 1981 and Title VII claims. *See* Pl.'s Resp. Br. Opp'n Mot. Summ. J. at 16 n. 5.

City in this regard. *See* N.C. Gen.Stat. § 160A–148(1); Winston–Salem, N.C., Ordinances, Related Laws, art. I, § 5; *Edwards v. City of Goldsboro,* 178 F.3d 231, 244–45 (4th Cir.1999). As such, Plaintiff's claim survives Defendants' summary judgment motion because questions of fact surrounding the preferable treatment of several black officers provide some evidence of policy or custom by the City, as implemented by the city manager. The City is thus properly liable for any equal protection violation Plaintiff may prove at trial.

In addition to the City, Plaintiff has also named various city and police officials in their individual and official capacities. The § 1983 claims against these officers in their official capacities are essentially suits against the City. *See Love–Lane v. Martin,* 355 F.3d 766, 783–84 (4th Cir.2004). Since these allegations are duplicative, Defendants' motion for summary judgment will be granted as to Plaintiff's § 1983 claims against each individual officer named in his or her official capacity.[10]

 Defendants also argue that the officers named in their individual capacities are entitled to qualified immunity from § 1983 liability. However, qualified immunity is only applicable when the actions taken were objectively reasonable "in light of the legal rules that were 'clearly established' at the time." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting *Har-*

*low v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–9, 73 L.Ed.2d 396 (1982)); *see also Lane,* 355 F.3d 766, 783–84. It would not be objectively reasonable for Defendants to believe they could lawfully terminate Plaintiff based, even in part, on her race. As stated above, questions of fact remain as to both the proffered reason for Plaintiff's firing (her alleged violation of police procedure) and whether race was a motivating factor. Since this court cannot conclude as a matter of law that race played no part in the officers' decisions, it is also prevented from concluding that Plaintiffs' supervisors had a good faith belief that their actions were entirely lawful. For that reason, qualified immunity does not apply or entitle the individual Defendants to a grant of summary judgment.

In short, because Plaintiff has demonstrated a genuine issue of material fact regarding race as a motivating factor in Defendants' decision, this court cannot, at this stage of the proceedings, conclude that Plaintiff was not deprived of equal protection, that the City did not have a policy or custom of race discrimination, and that the individual supervisors involved are entitled to qualified immunity on this claim. As such, Defendants' motion for summary judgment as to Plaintiff's equal protection claim under § 1983 against the City [11] and the officers named in their individual capacities [12] must be denied.

---

**10.** For the same reason, Defendants are entitled to summary judgment on Plaintiff's claims against these officers in their official capacities asserted under the North Carolina Constitution. Additionally, since the North Carolina Constitution only provides a cause of action against officers named in their official capacity, *Love–Lane v. Martin,* 355 F.3d at 789–90 (4th Cir.2004) (citing *Corum v. University of N.C.,* 330 N.C. 761, 787, 413 S.E.2d 276, 293 (1992)) summary judgment will also be granted as to all of Plaintiff's claims against each officer named in his or her individual capacity.

**11.** As noted above, North Carolina courts treat equal protection claims asserted under the state constitution as identical to § 1983 claims. Defendants' motion for summary judgment on Plaintiff's equal protection claim against the City, asserted under the North Carolina Constitution, is therefore denied.

**12.** Defendants' motion for summary judgment as to Plaintiff's equal protection claim against the officers, asserted under the North Carolina Constitution, is granted for the reasons set forth above.

### C. Plaintiff's State Law Claim of Wrongful Termination

 Plaintiff asserts that she was "wrongfully terminated" by Defendants "in violation of the common law of North Carolina." (Compl.¶¶ 1, 77.) Although Plaintiff appeared to allege termination in violation of North Carolina public policy, a tort claim, she later postured the claim as "essentially contractual" regarding a "breach of the terms of [her] employment." (Pl.'s Br. Opp'n Mot. Summ. J. at 19.) Plaintiff, relying on *Hill v. Medford*, 158 N.C.App. 618, 620, 582 S.E.2d 325, 327 (2003), apparently takes the position that her claim is quasi-contractual and therefore not barred by governmental immunity as a tort claim would be.

The court will treat the claim as one based on contract law, since Plaintiff has advanced only that theory in her responsive brief. Since that brief was filed, the North Carolina Supreme Court has overruled *Hill* based on the reasons set forth in the dissent to that opinion.[13] *Hill v. Medford*, 357 N.C. 650, 588 S.E.2d 467 (2003) (per curiam). The dissent concluded that "an employee terminable at will, who alleges wrongful discharge in violation of public policy, does not have a claim for breach of contract against his or her employer on that basis." *Hill*, 158 N.C.App. at 627, 582 S.E.2d at 331 (Martin, J., dissent). Since the North Carolina Supreme Court has adopted that rule, state law now mandates that Plaintiff may not, as an at-will employee, assert a breach of contract claim when an employment action allegedly violated public policy. As such, Defendants are entitled to summary judgment on Plaintiff's wrongful termination claim.

## III. CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Defendants' Motion for Summary Judgment [21] is GRANTED as to Plaintiff's Title VII and § 1981 claims against the Defendant-officers, Plaintiff's due process claims asserted under § 1983 and the North Carolina Constitution against all Defendants, Plaintiff's § 1983 equal protection claims against the Defendant-officers named in their official capacities, Plaintiff's equal protection claims asserted under the North Carolina Constitution against the Defendant-officers, and Plaintiff's state law claim of wrongful termination against all Defendants.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment [21] is DENIED as to Plaintiff's Title VII and § 1981 claims against the City, Plaintiff's § 1983 equal protection claims against the City and the Defendant-officers named in their individual capacities, and Plaintiff's equal protection claim asserted under the North Carolina Constitution against the City.

IT IS FURTHER ORDERED that Plaintiff's Motion to Strike Defendants'

---

**13.** In a suggestion of subsequently decided authority, filed in this court on December 23, 2003, Defendants directed the court's attention to the North Carolina Supreme Court's overruling of *Hill v. Medford*, 158 N.C.App. 618, 582 S.E.2d 325 (2003). Rather than simply submitting the case "without argument," as dictated by Local Rule 7.3(i), Defendants proceeded to argue that the subsequent decision undermined Plaintiff's position. *See* LR7.3(i). Plaintiff has moved to strike this filing, asserting that Defendants' inclusion of argument violated Local Rule 7.3(i). The court agrees that Defendants violated the Local Rule and will grant Plaintiff's motion to strike. The court will not, however, ignore the *Hill* decision, which clarifies a point of state law that is highly relevant to Plaintiff's wrongful termination claim.

Suggestion of Subsequently Decided Authority [53] is GRANTED.