Tucson W. JONES, and wife, Yvonne C. Jones, Plaintiffs,

v.

SOUTHCORR, L.L.C., Defendant.

No. 1:03CV00499.

United States District Court, M.D. North Carolina.

July 8, 2004.

Tucson W. Jones, Asheboro, NC, pro se.

Yvonne C. Jones, Asheboro, NC, pro se.

Melissa M. Kidd, Helms Mulliss & Wicker, P.L.L.C, Hamlin Landis Wade, Jr.,

Smith Helms Mulliss & Moore, Charlotte, NC, for Defendant.

*MEMORANDUM OPINION*

BEATY, District Judge.

## I. INTRODUCTION

This matter is currently before the Court on a Motion for Summary Judgment [Document # 12] filed by Defendant Southcorr, L.L.C. ("Defendant" or "Southcorr") as to Plaintiffs Tucson W. Jones ("Plaintiff") [1] and Yvonne C. Jones' claims. Plaintiff Tucson Jones claims that Defendant discriminated against him on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17, and in violation of the public policy of North Carolina as articulated in the North Carolina Equal Employment Practices Act (the "NCEEPA"), North Carolina General Statutes sections 143–422.1 to –422.3. Plaintiff Yvonne Jones claims that Defendant's unlawful actions deprived her of consortium with her husband, Tucson Jones. Also before the Court are two purported motions filed by Plaintiffs [Documents # 11, # 17], each entitled "Plaintiff's [sic] Motion to Dismiss Defendant's Motion for Summary Judgment."

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Viewing the evidence in the light most favorable to Plaintiffs, as this Court must do when deciding a motion for summary judgment, the Court will state the relevant facts. [2] Plaintiff Tucson Jones, an African–American male, was employed with Southcorr from October 2, 1997, until August 31, 1998. (Pl.'s Dep. at 17, 156.) Southcorr is a manufacturer and supplier of corrugated paper board located in Asheboro, North Carolina. (Daniel Morris Beam Aff. [Doc. # 14] (hereinafter "Beam Aff.") ¶ 2.) Plaintiff Tucson Jones was employed with Southcorr as a "strapper," which means that he was responsible for, among other things, ensuring that the paper-board products manufactured by the corrugator machine were properly strapped together. (Pl.'s Dep. at 72; Ron Parks Aff. [Doc. # 15] (hereinafter "Parks Aff.") ¶ 5.) Some of Southcorr's products must be single strapped, which means that there are two straps in one direction over the load. (Parks Aff. ¶ 5.) Waxed or coated products, however, must be double strapped, which means that there are two straps in one direction and two straps in the other direction. (*Id.*) Before the load is strapped, the strapper must place cap sheets (or "caps") both above and below the load. (*Id.;* Pl.'s Dep. at 72.) The purpose of putting the cap sheets on the load is to prevent the straps from digging into the edges of the boards and damaging them. (Pl.'s Dep. at 74.) The strapper must also bend the top cap sheets to prevent a sloppy load or a load without sufficient tension

---

1. Because Plaintiff Tucson Jones is the primary plaintiff in this case; unless otherwise noted, the Court will use the term "Plaintiff" to refer to Tucson (as opposed to Yvonne) Jones.

2. In Defendant's Reply Brief in Support of Defendant's Motion for Summary Judgment [Document # 21], Defendant contends that much of the evidence Plaintiffs have offered in opposition to Defendant's Motion for Summary Judgment is inadmissible and therefore should not be considered by this Court in ruling on Defendant's Motion. Because Defendant has not filed a motion to strike this evidence from the record, the Court will not strike this evidence from the record and will not address the substance of Defendant's evidentiary arguments in this Opinion. Suffice to say, the Court will only rely upon admissible evidence in ruling on Defendant's Motion for Summary Judgment. Regardless, the Court notes that, even taking into consideration the evidence that Defendant contends is inadmissible, the Court would still reach the same result with respect to each of Plaintiffs' claims.

on the straps. (*Id.* at 81; Parks Aff. ¶ 5.) It is the strapper's responsibility to ensure that loads are properly prepared before running the loads through the strapping machine. (Parks Aff. ¶ 5.)

During the course of Tucson Jones' employment with Southcorr, he was disciplined on multiple occasions. On November 4, 1997, Plaintiff received a "Verbal Warning" for being tardy to work. (Beam Aff. Ex. D; Pl.'s Dep. at 113–14.) On December 23, 1997, Plaintiff received a written warning[3] for again being tardy to work. (Beam Aff. Ex. D; Pl.'s Dep. at 127–28.) Plaintiff signed both his Verbal Warning and the Employee Disciplinary Report documenting his written warning concerning his tardiness. (Beam Aff. Ex. D.) In his deposition, Plaintiff admitted that he was in fact tardy on both of these days. (Pl.'s Dep. at 113–14, 127–28.) Other than these tardies, however, during the first several months of his employment, Plaintiff had no discipline or performance problems. He and Ron Parks ("Parks"), his supervisor, initially got along. (*See id.* at 113–14, 122–23.) In addition, Parks authorized, and Daniel Beam ("Beam") (Defendant's Production Manager) approved, raises for Plaintiff in October, November, and December 1997 based upon Plaintiff's good performance. (Beam Aff. ¶ 4, Exs. B–C.) Beginning in late February 1998, however, Plaintiff alleges that Parks began to "harass"[4] him by "telling him to perform other duties while his present duties were falling behind." (Pls.' Br. Opp. Def.'s Mot. Summ. J. [Doc. # 18] (hereinafter "Pls.' Br.") at 3.) But from March 5, 1998, through July 23, 1998, while Parks was not

functioning as Plaintiff's supervisor due to an on-the-job injury, Plaintiff received no discipline and was not harassed in any way. (*Id.*) In addition, during this period Plaintiff knew which loads needed to be double strapped because these loads "were highlighted by defendant as coated (2x2) orders . . . ." (*Id.*)

After Parks returned as Plaintiff's supervisor on July 24, 1998, however, Plaintiff contends that Parks immediately refused to cooperate with Plaintiff regarding breaks and refused to assist Plaintiff with the malfunctioning strapping machine. (*Id.* at 4.) From July 28, 1998, through his termination on August 31, 1998, Plaintiff was written up and harassed numerous times by Parks. On July 28, 1998, Parks gave Plaintiff a verbal warning for failing to double strap a coated load on July 27, 1998. (Parks Aff. ¶¶ 8–9, Ex. B; Pl.'s Dep. at 129–35.) The Employee Disciplinary Report documenting the warning stated that Plaintiff was being disciplined for the following offenses: "[f]ailure to follow instructions" and "[s]ubstandard work." (Parks Aff. Ex. B.) On July 30, 1998, Parks gave Plaintiff a written warning for the same mistake, and the Employee Disciplinary Report documenting this warning also stated that Plaintiff was being disciplined for "[f]ailure to follow instructions" and "[s]ubstandard work." (Parks Aff. ¶¶ 8–9, Ex. B; Pl.'s Dep. at 135–37.) Plaintiff contends that these lapses occurred because the run sheets for these loads did not contain the "2x2" notation. As a result, Plaintiff did not realize that these loads were coated and therefore did not

---

3. The Court notes that beginning on December 23, 1997, each time Plaintiff was disciplined, Parks prepared a written Employee Disciplinary Report. These reports specified what action was to be taken (either a verbal warning, a written warning, suspension, or dismissal) and the nature of the incident giving rise to the discipline. Each report was

signed by Parks and a witness, and each report provided a place for Plaintiff to sign.

4. There is no direct evidence that this "harassment" was on the basis of Plaintiff's race, and Plaintiff has not brought a racial harassment claim.

realize that these loads needed to be double strapped. (Pls.' Br. at 4–5; Pl.'s Dep. at 129–39.) Plaintiff therefore disputed (and continues to dispute) these disciplinary actions, and he therefore refused to sign these Employee Disciplinary Reports. (Parks Aff. ¶¶ 8–9, Ex. B; Pl.'s Dep. at 129–39.)

On July 31, 1998, Plaintiff met with Beam and Andre Savoy ("Savoy"), Southcorr's Logistics Coordinator. (Pl.'s Dep. at 138–39; Beam Aff. ¶ 4.) During this meeting, Beam and Savoy told Plaintiff that he had not been doing his job properly. (Pls.' Br. at 5; Pl.'s Dep. at 138–39.) Savoy agreed with Plaintiff, however, that "2x2" should be printed on the run sheets for coated loads. (Pls.' Br. at 5; Pl.'s Dep. at 139.) Beam nevertheless refused to allow "2x2" to be printed on the run sheets, stating that even if "2x2" were printed on the run sheets, Plaintiff would still not understand that he needed to double strap those loads. (Pls.' Br. at 5; Pl.'s Dep. at 139.) Beam instead asked Plaintiff whether he was having any problems at home. (Pls.' Br. at 5.)

On August 6, 1998, Plaintiff met with Diane Goins ("Goins"), Southcorr's Personnel Manager, and Bob Rogg ("Rogg"), Southcorr's General Manager, to discuss Plaintiff's concerns that he was being disciplined for no reason. (Pls.' Br. at 6–7.) Plaintiff explained to Goins and Rogg that Parks was not communicating to him which runs needed to be double strapped. (Id. at 6.) Both Goins and Rogg noticed that "2x2" was not being printed on the run sheets, and Rogg informed Plaintiff that he would ensure that "2x2" would be put back on the run sheets for coated loads. (Id.) However, Goins and Rogg apparently did not overturn the warnings that Parks had given Plaintiff on July 28 and July 30, because Plaintiff does not dispute that these warnings remained in Plaintiff's personnel record even after he

met with Goins and Rogg. Goins and Rogg also told Plaintiff that their doors were always open and that Southcorr would not tolerate any harassment by Parks or any other employee. (Id. at 6–7.) Before the meeting was over, Goins gave Plaintiff a copy of Defendant's "Harassment and Open Door Policy." (Id. at 7.)

Even after these meetings, however, Plaintiff alleges that Parks continued to harass him. On August 13, 1998, Plaintiff claims that Parks cheated him out of 22.3 hours by crossing these hours off his time card. (Id. at 8.) On August 14, 1998, Parks blamed Plaintiff for the strapping machine malfunctioning. (Id.) Parks' continued harassment of Plaintiff caused Plaintiff to fall behind schedule. (Id.) Parks then told Plaintiff that he was not allowed to take breaks or lunch. (Id.) On August 19, 1998, Parks told the maintenance personnel to stay away from the strapping machine. (Id. at 9.) Because Parks stopped the maintenance personnel from working on the strapping machine, Plaintiff again fell behind in his work. (Id.) However, when Parks took off work on August 20 and 21, Plaintiff's substitute supervisor did not prevent the maintenance personnel from working on Plaintiff's machine, nor did he harass or discipline Plaintiff. (Id.) On August 24, 1998, Parks returned to work. (Id. at 10.) He resumed harassing Plaintiff, and he prevented maintenance personnel from working on the strapping machine, which again caused Plaintiff to fall behind. (Id.)

On August 25, 1998, "Parks was having problems with" Plaintiff because the strapping machine was malfunctioning. (Id.) After the maintenance man fixed the machine, Parks told Plaintiff that Plaintiff was not bending down the cap sheets correctly. (Id.) Although Plaintiff had always bent the caps in one manner, Parks required him to bend the cap sheets a differ-

ent way. (*Id.*; Pl.'s Dep. at 146–47.) When Plaintiff did not bend the caps down the way Parks had requested, Parks instructed Plaintiff to punch out and go home. (Pls.' Br. at 10.) After receiving this instruction, Plaintiff demanded that a witness be present. (*Id.*) Once a witness was located, Plaintiff got his belongings and went to speak with Goins to complain about being harassed. (*Id.*) Parks followed Plaintiff into Goins' office and again instructed Plaintiff to go home. (*Id.*) Parks then prepared an Employee Disciplinary Report, citing Plaintiff for insubordination and failure to follow instructions. (Parks Aff. ¶¶ 8–9, Ex. B.) This report, which was also signed by Goins, stated that Plaintiff would be suspended for three days (August 26–28). (*Id.* Ex. B.)

When Plaintiff returned to work on August 26, 1998, he met with Beam and Goins. (Pl.'s Dep. at 155.) According to Plaintiff, Parks was not present at this meeting. (*Id.*)[5] However, Beam began to read Parks' report of the events of the preceding day. (*Id.*) When presented with the Employee Disciplinary Report, Plaintiff refused to sign the report. (*See id.*; Beam Aff. Ex. E.) During this meeting, Beam informed Plaintiff that if Plaintiff again refused to follow his supervisor's instructions, he would be terminated. (Beam Aff. ¶ 9; Pl.'s Dep. at 155–56.) After the meeting ended, Plaintiff went home and did not return until Monday, August 31, 1998.

Shortly after returning to work on August 31, Parks and Plaintiff were again having problems. (Pls.' Br. at 12.) When Plaintiff started working, he realized that 2x2 was again not being printed on the run sheets for the coated loads. (*See id.*) However, because the first-shift strapper had highlighted which runs were coated on the Wet/Dry End Report, Plaintiff knew which loads were coated and therefore was able to properly double strap these loads. (*Id.*) Plaintiff alleges that Parks and Savoy had tried to trick Plaintiff into single strapping coated loads, and Parks became furious when Plaintiff was able to properly double strap the coated loads even though 2x2 was not printed on the run sheets. (*Id.*)

Later that day, Parks told Plaintiff that Plaintiff was not putting the caps on the loads the way that Parks had instructed him to. (*Id.* at 12–13; Pl.'s Dep. at 158–59.) Plaintiff explained that he was capping the loads the same way he had been capping loads since he started working at Southcorr. (Pls.' Br. at 12–13.) Parks then "asked [Plaintiff to] restack a load that already had caps on the top and bottom of that load, and for no reason at all, he took the cap off the top and asked [Plaintiff] to flip[6] that load, [and] then [Plaintiff] refused." (Pl.'s Dep. at 159.) Plaintiff told Parks that there wasn't anything wrong with the load and asked Parks why it needed to be flipped. (*Id.*) Parks replied, "Do it because I told you to do it." (*Id.* at 165 (internal quotation marks omitted).) When Parks again instructed Plaintiff to flip the load, Plaintiff again refused. (*Id.* at 159.) Parks then called Savoy over to where he and Plaintiff were and again asked Plaintiff to flip the load. (*See id.* at 159–60.) When Plaintiff again refused, Parks instructed Plaintiff to leave the strapping machine and go to the front office. (*Id.* at 160.)

At that point, Edward Scott ("Scott"), who is white, came over to operate the strapping machine in Plaintiff's place. (*Id.* at 170.) At the time this incident oc-

---

5. Parks and Beam stated in their affidavits that Parks was present at this meeting. (Parks Aff. ¶ 10; Beam Aff. ¶ 9.)

6. It is unclear from the materials submitted by the parties whether there is a difference between "restacking" a load and "flipping" a load.

curred, Scott was a "wet end assistant," although he had previously been a strapper (Plaintiff's position) and a "tally." (Beam Aff. ¶ 13, Exs. I–L.) Parks then instructed Scott to "[f]lip that board," and Scott refused. (Pl.'s Dep. at 171; Pls.' Br. at 13.) Scott said that he was going to "derail" [7] the load instead and let the tallies flip it because that was part of their job description. (Pl.'s Dep. at 171.) Parks apparently then went to the front office and met with Savoy and Beam. (*See id.* at 160–61.) Plaintiff was then called into the office, and Beam asked Plaintiff if he had refused Parks' instruction to flip the load. (*Id.* at 161.) Plaintiff admitted that he had, and Beam terminated him. (*Id.*) [8] Defendant then filled Plaintiff's position with a white employee. (Def.'s Answer [Doc. # 4] ¶ 7.)

Plaintiff timely filed a charged with the Equal Employment Opportunity Commission ("EEOC") on November 13, 1998, and the EEOC issued Plaintiff a right-to-sue letter on or about March 30, 1999. Plaintiffs then timely filed a complaint in the Superior Court of Guilford County, North Carolina, which was transferred to the Superior Court of Randolph County, North Carolina. Plaintiffs' lawsuit in state court was dismissed without prejudice on January 15, 2003, because Plaintiffs failed to appear for their depositions.

Plaintiffs then refiled their case in this Court on May 28, 2003. (*See* Compl. [Doc. # 1]) On December 29, 2003, after discovery was completed, Defendant filed its Notice of Intent to File Dispositive Motion [Document # 10]. Apparently in response to Defendant's Notice, on December 31, 2003, Plaintiffs filed a Motion to Dismiss Defendant's Motion for Summary Judgment [Document # 11]. Defendant then filed its Motion for Summary Judgment on January 22, 2004. On February 9, 2004, Plaintiffs filed another Motion to Dismiss Defendant's Motion for Summary Judgment [Document # 17].

The Court has jurisdiction of Plaintiff's Title VII claims pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction of Plaintiff's state-law wrongful-discharge claim and Plaintiff Yvonne Jones' loss-of-consortium claim pursuant to 28 U.S.C. § 1367. The issues having been fully briefed by the parties, this matter is ripe for adjudication.

## III. PLAINTIFFS' PURPORTED MOTIONS TO DISMISS DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Court will first consider Plaintiffs' purported Motions to Dismiss Defendant's Motion for Summary Judgment. This Court agrees with Defendant's Explanation and Response to Plaintiffs' Purported Motions [Document # 23] that Plaintiffs appear to have filed these "Motions" due to a lack of familiarity with this Court's local rules governing motion practice. With respect to Plaintiffs' first Motion, this Motion is denied because Plaintiffs are not permitted to move to dismiss Defendant's Notice to File Dispositive Motion. With respect to Plaintiffs' second Motion, it appears that this Motion is more appropriately viewed, if anything, as a Response to Defendant's Motion for Summary Judgment. As such, this Motion is denied, but, to the extent relevant, the Court will consider the substance of this Motion in deciding whether to grant or deny Defendant's

7. It is unclear to the Court whether the proper terminology is "derail" or "dead rail."

8. Although Plaintiff never received a copy of the Employee Disciplinary Report documenting the reasons for his termination on August 31, 1998, he concedes that he refused Parks' instructions on that date and that Beam terminated him when he admitted that he had refused those instructions. (*See* Pl.'s Dep. at 156, 161.)

Motion for Summary Judgment. Having denied both of Plaintiffs' purported Motions, the Court will now address Defendant's Motion for Summary Judgment.

## IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is considered "material" if it "might affect the outcome of the suit under the governing law ...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Under this standard, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* As a result, the Court will only enter summary judgment in favor of the moving party when " 'the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the [nonmoving] party cannot prevail under any circumstances.' " *Campbell v. Hewitt, Coleman & Assocs.*, 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 249 (4th Cir.1967)).

When ruling on a summary judgment motion, the Court "view[s] the evidence in the light most favorable to the non-moving party, granting that party the benefit of all reasonable inferences." *Bailey v. Blue Cross & Blue Shield of Va.*, 67 F.3d 53, 56 (4th Cir.1995). The moving party bears the initial "burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law." *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir.1992) (en banc). Once the moving party has met this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* In so doing, the nonmoving party may not rest on mere allegations, denials, or unsupported assertions, but must, through affidavits or otherwise, provide evidence of a genuine dispute. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510; *Catawba Indian Tribe*, 978 F.2d at 1339. In other words, the nonmoving party must show "more than ... some metaphysical doubt as to the material facts," for the mere existence of a scintilla of evidence in support of its position is insufficient to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Catawba Indian Tribe*, 978 F.2d at 1339.

### B. Title VII Claims

■ As discussed above, Plaintiff Tucson Jones is suing Defendant for unlawfully discriminating against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17.[9] A Title

---

**9.** Plaintiff contends in his Response Brief that Defendant also failed to pay Plaintiff all the wages he was due and retaliated against him in violation of Title VII. Defendant points out in its Reply Brief, however, that these claims were not included in Plaintiff's EEOC charge, Plaintiff failed to allege them in his Complaint, and there was no discovery on these claims. The Court finds that Plaintiff did not raise either of these claims in his EEOC charge (*see* Pls.' Mot. Amend Exs. & Trs. Ex. 1 [Doc. # 6].), and he therefore cannot pursue a

Title VII claim on the basis of these allegations. *See, e.g., Ijames v. Murdock*, No. 1:01CV00093, 2003 WL 1533448, at \*4 (M.D.N.C. Mar.21, 2003) (citing *Bryant v. Bell Atlantic Md., Inc.*, 288 F.3d 124, 132–33 (4th Cir.2002)) (holding that a claim of retaliation is not "reasonably related" to a claim of racial discrimination). In addition, the Court also finds that these allegations were not raised in Plaintiff's Complaint, which prevents him from pursuing these claims in this

VII Plaintiff may establish a claim for intentional discrimination through two modes of proof: the mixed-motive theory and the pretext theory. As this Court discussed in its recent opinion in *Rishel v. Nationwide Mutual Insurance Co.*, 297 F.Supp.2d 854 (M.D.N.C.2003), prior to the Supreme Court's decision in *Desert Palace v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), a plaintiff could only utilize the mixed-motive theory if he presented direct evidence of discrimination. In the present case, it is undisputed that Plaintiff has offered no direct evidence of discrimination. Therefore, before *Desert Palace*, Plaintiff would have been precluded from using the mixed-motive theory and would have been required to prove his case in accordance with the burden-shifting, or pretext, approach established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Rishel*, 297 F. Supp 2d at 860 (citing *McDonnell Douglas*). Under the *McDonnell Douglas*, or pretext, scheme of proof, the plaintiff must first prove, by a preponderance of the evidence, a prima facie case of discrimination. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, —— n. 3, 124 S.Ct. 513, 517 n. 3, 157 L.Ed.2d 357 (2003) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824). Once the plaintiff has established his prima facie case, the defendant must articulate a legitimate, nondiscriminatory reason for its employment action. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824). "If the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the em-

ployer's explanation is pretextual." *Id.* (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000)). In light of *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the plaintiff is no longer required to show pretext *plus* some additional evidence of discrimination. *Id.* at 148, 120 S.Ct. at 2109; *see Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000) (applying *Reeves*). In other words, the Court may infer the ultimate fact of discrimination merely from the falsity of the defendant's proffered explanation. *Rowe*, 233 F.3d at 830.

■ After *Desert Palace*, however, to prevail in a mixed-motive case, a plaintiff need not present direct evidence of discrimination, but must only present sufficient evidence that racial (or other illegal) discrimination motivated the employer's adverse employment decision. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir.2004) (en banc), *petition for cert. filed*, 72 U.S.L.W. 3673 (Apr. 5, 2004) (No. 03–1443). As Judge James Knoll Gardner in the Eastern District of Pennsylvania has recently noted, "district courts around the country have wrestled with how to apply [*Desert Palace*] within the existing framework of *McDonnell Douglas*." *Lloyd v. City of Bethlehem*, No. Civ.A. 02–CV–00830, 2004 WL 540452, at *3 (E.D.Pa. Mar.3, 2004). The court in *Lloyd* noted that two lines of authority have emerged. The first was articulated in *Dare v. Wal–Mart Stores, Inc.*, 267 F.Supp.2d 987 (D.Minn.2003), in which the district court "predicted the demise of the *McDonnell Douglas* burden-

case. *Cf. Beck v. City of Durham*, 129 F.Supp.2d 844, 855 (M.D.N.C.2000) (holding that a plaintiff cannot create additional claims in his response to a defendant's motion to dismiss). Finally, these claims are also sub-

ject to dismissal because there is insufficient evidence in the record to support Plaintiff's purported claims for relief on the theories described above.

shifting analysis." *Lloyd*, 2004 WL 540452, at *4 (citing *Dare*). The second line of authority was articulated in *Dunbar v. Pepsi–Cola Gen. Bottlers of Iowa*, 285 F.Supp.2d 1180 (N.D.Iowa 2003), in which the district court retained the *McDonnell Douglas* burden-shifting scheme but merely "split the third element of the burden-shifting analysis to accommodate both pretext and mixed-motive cases." *Lloyd*, 2004 WL 540452, at *4 (citing *Dunbar* ).

On December 29, 2003, this Court issued its opinion in *Rishel v. Nationwide Mutual Insurance Co.* and adopted the analysis of the district court in *Dunbar*. In *Rishel*, the plaintiff sought to pursue his case under both a traditional pretext theory and a mixed-motive theory. Consistent with *Dunbar*, this Court required the plaintiff in *Rishel* to first prove a prima facie case of discrimination. Once the plaintiff proved his prima facie case, the burden of production shifted to the defendant to articulate a legitimate, non-discriminatory reason for its decision. Because the defendant was able to meet its burden, the plaintiff was required to prove "either (1) that the defendant's reason [was] not true, but [was] instead a pretext for discrimination . . .; or (2) that the defendant's reason, while true, [was] only one of the reasons for its conduct, and another 'motivating factor' was the plaintiff's protected characteristic . . . ." *Rishel*, 297 F.Supp.2d at 865 (internal quotations omitted).

Exactly one week after this Court issued its decision in *Rishel*, however, the Fourth Circuit Court of Appeals issued its en banc decision in *Hill v. Lockheed Martin Logistics Management, Inc.*, which was the first opinion from the court of appeals addressing the impact of *Desert Palace* at the summary judgment stage. In *Hill*, the plaintiff pursued her discrimination claims under both the mixed-motive and pretext frameworks.

*See Hill*, 354 F.3d at 285. In analyzing the plaintiff's claims, the court of appeals wholly separated its discussion of the mixed-motive theory from the pretext theory, that is, the court seemingly did not require the plaintiff to prove a prima facie case of discrimination to proceed under the mixed-motive theory. In *Hill*, however, the court of appeals' rejection of the plaintiff's claim under the mixed-motive theory was based on the plaintiff's failure to proffer any evidence (direct or indirect) that the person principally responsible for terminating her (the "actual decisionmaker") was motivated by unlawful discriminatory animus. Instead, the plaintiff had proffered direct evidence of discrimination by one of her supervisors, but the court of appeals found, as a matter of law, that the supervisor was not the "actual decisionmaker" with respect to the plaintiff's termination. Thus, the plaintiff's direct evidence of discrimination by one of her supervisors was insufficient to demonstrate a genuine issue of material fact that her employer's decision had been tainted by impermissible bias. With respect to the plaintiff's claim under the *McDonnell Douglas* pretext theory, the court found that, even assuming the plaintiff could show a prima facie case of discrimination, she failed to proffer any evidence that her employer's reason for terminating her "was a pretext for discrimination on the part of its relevant decisionmakers." *Id.* at 298.

In the present case, it is unclear from Plaintiff's pro se brief whether he is pursuing his case under the mixed-motive theory, the pretext theory, or both theories. Defendant apparently contends that this case is a traditional pretext case because it does not even address *Desert Palace* or the mixed-motive framework. The Court will therefore assume that the pro se Plaintiff seeks to utilize both theories. The initial question before the Court, therefore, is whether *Hill's* application of

*Desert Palace* at the summary judgment stage requires this Court to depart from the analytical framework the Court set forth in *Rishel v. Nationwide,* under which a plaintiff with evidence similar to that of this Plaintiff must first demonstrate a prima facie case of discrimination in order to bring a claim under either a mixed-motive or a pretext theory. The Court notes that, unlike in *Hill,* the only evidence linking Plaintiff's termination to unlawful discrimination is the evidence that Plaintiff was replaced by a white employee and that he was disciplined more harshly than a white employee. Thus, while in *Hill* the plaintiff stated that her supervisor had called her a "useless old lady," a "damn woman," and "a troubled old lady," and further said that "they need[ed] to retire her," there is no similar evidence of discriminatory intent before the Court in the present case. Plaintiff has not, for example, offered any evidence that any Southcorr employee spoke about African Americans in a derogatory manner.[10]

Plaintiff's entire case depends, therefore, on whether he can demonstrate unlawful discrimination based on the more favorable treatment of other employees who are not African American. It is exactly this type of situation that the *McDonnell Douglas* burden-shifting approach—and *Rishel's* application of that

approach in light of *Desert Palace*—is designed to handle. As the Supreme Court held in *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), "[t]he *McDonnell Douglas* division of intermediate evidentiary burdens serves to bring the litigants and the court expeditiously and fairly to [the] ultimate question," that is, whether the plaintiff was the victim of unlawful discrimination. *Id.* at 253, 101 S.Ct. at 1093–94. The Court further notes that the Supreme Court has recently reaffirmed the vitality of the *McDonnell Douglas* scheme of proof, noting that "[t]he Courts of Appeals have consistently utilized this burden-shifting approach when reviewing motions for summary judgment in disparate treatment cases." *See Raytheon Co.,* 540 U.S. at —— n. 3, 124 S.Ct. at 517 n. 3.

 In summary, therefore, the Court finds that Plaintiff's case is most appropriately analyzed under the "modified *McDonnell Douglas* proof scheme" adopted by this Court in *Rishel. See Rishel,* 297 F.Supp.2d at 866 (citing *Dunbar*). Because it is not clear from Plaintiff's Complaint whether Plaintiff is pursuing a claim of racially disparate treatment in the enforcement of disciplinary measures or the separate but interrelated claim of racially discriminatory discharge, the Court will analyze both claims.[11] *See*

---

10. Of course, if Plaintiff did have other sufficiently probative evidence that Beam (or Parks, assuming Plaintiff could show that Parks was an actual decisionmaker under *Hill*) was motivated by an unlawful discriminatory animus, Plaintiff would be able to utilize the mixed-motive approach without resorting to *Rishel's* modified *McDonnell Douglas* scheme of proof. *See EEOC v. Warfield–Rohr Casket Co.,* 364 F.3d 160, 163 & n. 1 (4th Cir.2004) (holding that the plaintiff demonstrated a genuine issue of age discrimination by alleging that the defendant told him "that he was 'getting ... too old' and ... that a much younger employee 'could give [the defendant] more years' " (first alteration in original)).

11. In Defendant's Brief in Support of Defendant's Motion for Summary Judgment, Defendant seems to request the Court to combine both claims into one prima facie case, with Plaintiff having to show disparate treatment either by showing that he was disciplined more harshly than a similarly situated white employee (discriminatory enforcement of disciplinary measures) or that he was replaced by a similarly situated white employee (discriminatory discharge). The flaw with this approach, however, is that the typical prima facie showing for a claim of discriminatory discharge includes a requirement that the plaintiff show that he was performing at his employer's legitimate expectations. *See Brinkley v. Harbour Recreation Club,* 180 F.3d

*Worster v. United States Postal Serv.*, 132 F.Supp.2d 397, 406 (M.D.N.C.2001) (analyzing plaintiff's discrimination claim as both a claim for discriminatory discharge and a claim for discriminatory enforcement of disciplinary measures when it was unclear from the plaintiff's complaint which claim the plaintiff was asserting), *aff'd per curiam*, 28 Fed.Appx. 324 (2002). As such, Plaintiff must first demonstrate a prima facie case of either discriminatory enforcement of disciplinary measures or discriminatory discharge. *Cf. Disher v. Weaver*, 308 F.Supp.2d 614, 620 (2004) (analyzing the plaintiff's claim for discriminatory enforcement of disciplinary measures in light of *Desert Palace* and first determining whether the plaintiff had established a prima facie case of disparate discipline). If Plaintiff proves his prima facie case, he will create "a legally mandatory, rebuttable presumption" of discrimination, which Defendant must then rebut by producing evidence that its decision was made for a legitimate, nondiscriminatory reason. *See Burdine*, 450 U.S. at 254 & n. 7, 101 S.Ct. at 1094 & n. 7. If Defendant satisfies its burden of production, the presumption of discrimination drops from the case, and Plaintiff must then "present sufficient evidence from which a reasonable jury could find that the decision to terminate Plaintiff was motivated by discriminatory reasons." *Rishel*, 297 F.Supp.2d at 866 (internal quotations omitted). Of course, as the Supreme Court explained in *Burdine*, the defendant's articulation of a legitimate, nondiscriminatory reason for its actions only "destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly

drawn therefrom may be considered" to determine whether the plaintiff has carried his ultimate burden to prove unlawful discrimination. *See Burdine*, 450 U.S. at 255–56 & 255 n. 10, 101 S.Ct. at 1095 & n. 10.

### 1. Prima Facie Case of Discriminatory Enforcement of Disciplinary Measures

██ In order for Plaintiff to establish a prima facie case of discriminatory enforcement of disciplinary measures, Plaintiff must prove the following three elements: (1) he is a member of a protected class; (2) the prohibited conduct he engaged in was of comparable seriousness to the misconduct of employees outside the protected class; and (3) the disciplinary measures enforced against him were more severe than those enforced against employees outside the protected class. *See Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir.1993) (citing *Moore v. City of Charlotte*, 754 F.2d 1100, 1105–06 (4th Cir. 1985)); *accord Deberry v. Runyon*, No. 1:97CV00777, 1998 U.S. Dist. LEXIS 12532, at *12 (M.D.N.C. Apr. 20, 1998). Plaintiff's only evidence in support of his claim that he was disparately treated in the enforcement of disciplinary measures is his evidence that Edward Scott, a white employee, also refused Parks' instruction to flip the loads but was not terminated (or even disciplined at all). The question before the Court, therefore, is whether this evidence is sufficient to satisfy each element of Plaintiff's prima facie case. It is obvious that Plaintiff satisfies element one of his prima facie case, that is, Plaintiff is an African–American male.

598, 607 (4th Cir.1999). The prima facie showing for a claim of discriminatory enforcement of disciplinary measures, however, does not. *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir.1993) (citing *Moore v. City of Charlotte*, 754 F.2d 1100, 1105–06 (4th

Cir.1985)); *Disher v. Weaver*, 308 F.Supp.2d 614, 620 (M.D.N.C.2004). Because the elements of the prima facie cases are different, the Court will analyze Plaintiff's claims separately.

■ The question, therefore, is whether Plaintiff has shown that he was more severely disciplined than Scott for engaging in comparable misconduct. To make this showing, Plaintiff must show that he and Scott were "similarly situated." In order for this Court to determine whether Plaintiff has shown that he and Scott were similarly situated, this Court " 'must look at all relevant factors, the number of which depends on the context of the case.' " *Disher*, 308 F.Supp.2d at 621 (quoting *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 619 (7th Cir.2000)). "The Fourth Circuit has held that summary judgment for the employer is proper under a discriminatory enforcement claim where the plaintiff has not proffered sufficient evidence that similarly situated white employees were treated more favorably." *Gaither v. Wake Forest Univ.*, 129 F.Supp.2d 863, 869 (M.D.N.C.2000) (citing *Cook*, 988 F.2d at 512). When considering Plaintiff's claim, this Court must consider the entire record and not merely focus on one part of the record. *Id.* (citing *Cook*). Although the Fourth Circuit Court of Appeals has provided little direct guidance on this issue, another court in this district has noted that "other circuits have held that a plaintiff must show that he or she was similarly situated to other employees from outside his protected class in all relevant aspects." *Truesdale v. Potter*, No. 1:01CV00427, 2003 WL 1522945, at *5 (M.D.N.C. Mar.24, 2003) (citing *Radue*, 219 F.3d at 617; *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997) (per curiam)).

■ In the present case, Defendant appears to concede that, at least at the time of the August 31, 1998, incidents in question, Plaintiff and Scott both had the same supervisor (Parks). Defendant still contends that Plaintiff has failed to show that he was more severely disciplined than Scott for engaging in conduct of comparable seriousness because Plaintiff's disciplinary record was far worse than Scott's.

The Court agrees with Defendant that different disciplinary histories can be a relevant factor in determining whether Plaintiff has made out his prima facie case. *See Cook*, 988 F.2d at 511; *Chenowith v. Asplundh Tree Expert Co.*, 928 F.Supp. 605, 610 (D.Md.1996); *Deberry*, 1998 U.S. Dist. LEXIS 12532, at *14–20. Accordingly, the Court will examine Plaintiff's and Scott's disciplinary records to determine whether Plaintiff has shown that he was more severely disciplined than Scott for engaging in conduct of comparable seriousness.

### a. Plaintiff's Disciplinary Record

In this case, the evidence is undisputed that Defendant's disciplinary record included the following six incidents. On each occasion, Ron Parks was the supervisor who disciplined Plaintiff. On November 4, 1997, Plaintiff received a Verbal Warning for being tardy to work. (*See* Beam Aff. Ex. D; Pl.'s Dep. at 113–14.) On December 23, 1997, Plaintiff received a written warning for again being tardy to work. (*See* Beam Aff. Ex. D; Pl.'s Dep. at 127–28.) Plaintiff signed both his Verbal Warning and the Employee Disciplinary Report documenting his written warning. (*See* Beam Aff. Ex. D.) In his deposition, Plaintiff admitted that he was in fact tardy on both of these days. (Pl.'s Dep. at 113–14, 127–28.)

On July 28, 1998, and July 30, 1998, Parks gave Plaintiff a verbal warning and a written warning, respectively, for failing to double strap a coated load. (Parks Aff. ¶¶ 8–9, Ex. B; Pl.'s Dep. at 129–37.) The Employee Disciplinary Reports documenting these warnings stated that Plaintiff was being disciplined for the following offenses: "[f]ailure to follow instructions" and "[s]ubstandard work." (Parks Aff. Ex. B.) Although Plaintiff refused to sign these Employee Disciplinary Reports, he does not dispute that he received them.

On August 26, 1998, Parks wrote Plaintiff up for insubordination and failure to follow instructions. (Parks Aff. ¶¶ 8–9, Ex. B; Beam Aff. ¶¶ 8–9, Ex. E.) When presented with the Employee Disciplinary Report (dated August 25, 1998) documenting the reasons why he was being suspended, Plaintiff refused to sign it, but he does not dispute that he received it. (*See* Beam Aff. Ex. E; Pl.'s Dep. at 155.) After giving Plaintiff this disciplinary report, Beam informed Plaintiff that if Plaintiff again refused to follow a supervisor's instructions, he would be terminated. (Beam Aff. ¶¶ 9, 14; Pl.'s Dep. at 155–56.)

Finally, on August 31, 1998, Plaintiff repeatedly refused to follow Parks' instructions to flip a load. (Pl.'s Dep. at 156–61.) After admitting to Beam that he had refused Parks' instructions, Beam terminated him, as he had advised Plaintiff he would do if Plaintiff again failed to follow Parks' instructions. (*Id.* at 161.)

### b. Edward Scott's Disciplinary Record

In comparing Plaintiff's disciplinary record with Scott's, the Court finds that the evidence shows that Scott was disciplined on two occasions prior to August 31, 1998. On December 1, 1997, Parks gave Scott a verbal warning for substandard work and defective and improper work. (Beam Aff. ¶¶ 13–14, Ex. J.) On December 17, 1997, Parks gave Scott a written warning for failure to follow instructions, substandard work, carelessness, and defective and improper work. (*Id.*) [12] This is the entirety of the disciplinary record against Scott, and it shows that only one of the warnings Scott received was for failure to follow instructions, and neither was for insubordination.

### c. Whether Parks and Scott Had Similar Disciplinary Records

Defendant thus contends that Plaintiff and Scott did not engage in conduct of comparable seriousness because Plaintiff had a much worse disciplinary record than Scott. The Court agrees that the similarity (or dissimilarity) of Plaintiff's and Scott's disciplinary records is a relevant factor in this case to determine if Plaintiff and Parks engaged in conduct of comparable seriousness. In the present case, it is undisputed that Plaintiff's disciplinary record was worse than Scott's. Within approximately one month prior to his termination, Plaintiff was cited two times for failure to follow instructions, and one for insubordination (excluding the offense that resulted in his termination). (*Id.* ¶¶ 4–10 & Exs. D–E.) [13] Although Plaintiff disputes Defendant's reasons for giving him these warnings, he does not dispute that he was made aware of the reasons for these disciplinary actions. In addition, Plaintiff also does not dispute that Beam specifically cautioned him on August 26, 1998, that he would be terminated if he again ignored his supervisor's instructions. (*See id.* ¶¶ 9, 14; Pl.'s Dep. at 155–56.) Finally, Plaintiff conceded in his deposition that, despite

---

**12.** On January 18, 2001, Scott also received a verbal warning from a different supervisor for substandard work. (Beam Aff. Ex. K.) This disciplinary action is not relevant to the Court's determination of whether Scott and Plaintiff engaged in conduct of comparable seriousness because it occurred after August 31, 1998.

**13.** The Court notes that in the Employee Disciplinary Report Plaintiff received on July 28, 1998, for failure to follow instructions on July 27, 1998, Defendant indicated that this was Plaintiff's first offense. (Beam Aff. ¶ E.) Therefore, the Court finds that Plaintiff's two tardies in November and December 1997 are not relevant to a comparison of Plaintiff's and Scott's disciplinary records because it appears that Defendant did not factor these tardies into its decision to discipline Plaintiff in July and August 1998.

Beam's warning to him that any further insubordination would result in his termination, he still refused to flip the load when Parks instructed him to. (Pl.'s Dep. at 158–60.)

Plaintiff has failed to offer any evidence that Scott had a similar or worse disciplinary record than Plaintiff. Only one of Scott's warnings was for failure to follow instructions and none were for insubordination. Furthermore, these warnings had occurred over eight months prior to August 31, 1998, whereas Plaintiff had been repeatedly warned in the weeks leading up to his termination about his failure to follow instructions. Finally, and perhaps most critically, there is no evidence that Scott, unlike Plaintiff, was given a final warning that an additional instance of insubordination would result in his termination.[14]

Thus, looking at the record as a whole, the Court finds that Plaintiff has failed to demonstrate a prima facie case of discriminatory enforcement of disciplinary measures.[15] The Court will therefore consider whether Plaintiff has demonstrated a prima facie case of discriminatory discharge.

### 2. Prima Facie Case of Discriminatory Discharge

As this Court discussed above, to establish a prima facie case of discriminatory discharge, Plaintiff must show the following four elements: "(1) that [he] is a member of a protected class; (2) that [he] suffered an adverse employment action; (3) that at the time of the adverse employment action [he] was performing at a level

14. The Court notes that whether Plaintiff has failed to satisfy element two or failed to satisfy element three of his prima facie case is somewhat unclear from the case law, and it seems to depend in part on how the Court characterizes the facts of this case. If Plaintiff's and Scott's misconduct is characterized as simply being insubordination, *Cook* would suggest that Plaintiff satisfied element two because both Plaintiff and Scott engaged in acts of comparable seriousness (i.e., insubordination), but Plaintiff did not satisfy element three because he has shown no evidence that Scott had a similar disciplinary history and therefore Plaintiff was not disciplined more severely than Scott. *See Cook*, 988 F.2d at 511–12. But if Plaintiff's misconduct is characterized as a *repeated* failure to follow instructions and insubordination but Scott's misconduct is characterized as simply the one instance of insubordination, *Chenowith* would suggest that Plaintiff failed to satisfy element two because he has not offered sufficient evidence that he and Scott engaged in acts of comparable seriousness. *See Chenowith*, 928 F.Supp. at 610. The ultimate question under both *Cook* and *Chenowith* (which relies upon *Cook*), however, is whether Plaintiff has made a prima facie showing that he was more severely disciplined than Scott for engaging in misconduct of comparable seriousness. The Court finds that he has not.

15. The Court notes that in *Featherstone v. United Parcel Servs., Inc.,* No. 94–2331, 1995 WL 318596 (4th Cir. May 23, 1995) (per curiam), the court of appeals, in an unpublished decision, held that the plaintiff's failure to "establish whether the prior disciplinary record of the other [employee] was in any way comparable to his own" did not prevent the plaintiff from establishing a prima facie case of disparate discipline. *Id.* at *5. Instead, the court of appeals held that the defendant's evidence of the differences between the two employees' disciplinary records constituted the defendant's legitimate nondiscriminatory reason for terminating the plaintiff but not disciplining the other employee. *Id.* Finding that the plaintiff had failed to discredit the employer's legitimate, nondiscriminatory reason, the court of appeals held that the plaintiff had failed to make out a claim for race discrimination. In the present case, even if this Court were to find that Plaintiff had made out a prima facie case of disparate discipline, Plaintiff has still failed to show that Defendant's reason for terminating him (repeated misconduct) and not disciplining Scott (no repeated misconduct) was a pretext for unlawful discrimination. He has further failed to show sufficient evidence that Defendant was motivated by an unlawful discriminatory animus. Thus, Plaintiff's disparate discipline case fails as a matter of law.

that met [his] employer's legitimate job expectations; and (4) that the position remained open to or was filled by similarly qualified applicants outside the protected class." *See Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 607 (4th Cir. 1999).

It is clear that Plaintiff has met his burden of proof with respect to elements one and two of his prima facie case. Furthermore, the Court will assume that Plaintiff has satisfied his burden to demonstrate element four. The Court will therefore address Defendant's contention that Plaintiff has failed to satisfy element three.

With respect to element three, Defendant contends that "Plaintiff has failed to produce any evidence that he was performing in a satisfactory manner at the time of his termination ...." (Def.'s Br. Supp. Mot. Summ. J. at 9–10.) The Court notes, however, that Defendant has produced substantial evidence that Plaintiff was not performing in a satisfactory manner. In their affidavits, Beam and Parks stated that Plaintiff repeatedly failed to follow instructions and was insubordinate. (Beam Aff. ¶¶ 4–11; Parks Aff. ¶¶ 7–12, 15–16.) Parks further explained that Plaintiff continued to improperly bend the cap sheets on the top caps of the loads. (Parks Aff. ¶¶ 9, 12.) In addition, both Beam and Parks attested to the multiple disciplinary reports that Plaintiff received for failure to follow instructions and insubordination. (Beam Aff. ¶ 4, Exs. D–E; Parks Aff. ¶¶ 8–12, Exs. B, D.) Beam and Parks both stated that on the day Plaintiff was terminated, he was repeatedly insubordinate, and he was terminated for this insubordination. (Beam Aff. ¶ 10; Parks Aff. ¶ 12.)

▮ Although Plaintiff conceded in his deposition that he was insubordinate on August 31, 1998 (the day he was terminated), he disputes Beam's and Parks' accounts of his work performance. (*See* Pl.'s

Dep. at 161.) Plaintiff contends that on the dates he was written up, he was performing his duties the way he was trained. In his Response Brief, Plaintiff explained that when he worked under supervisors other than Parks, his method of capping the loads had never been questioned. Plaintiff further explained in his Response Brief that he refused to flip the load on August 31, 1998, because "[i]n the past ..., the plaintiff was always given the option to derail loads ...." (Pls.' Br. at 17.) The critical flaw with Plaintiff's argument that he was performing his job up to Southcorr's expectations is that Plaintiff's "own testimony ... cannot establish a genuine issue as to whether [Plaintiff] was meeting [Defendant's] expectations." *King v. Rumsfeld,* 328 F.3d 145, 149 (4th Cir.) (citing *Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 960–61 (4th Cir. 1996)), *cert. denied,* —— U.S. ——, 124 S.Ct. 922, 157 L.Ed.2d 742 (2003). As the court of appeals has explained, " '[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.' " *Id.* (citing *Evans*). In the present case, Plaintiff has merely offered his own subjective opinion that his performance was satisfactory. Such a showing, however, is insufficient to survive Defendant's Motion for Summary Judgment. *See Frank v. England,* 313 F.Supp.2d 532, 538 (D.Md.2004) (citing *King*) (holding that the plaintiff had failed to show his performance was satisfactory where he "simply maintained that he thought he was following the standard procedures"); *Bryan v. Lucent Techs.,* 307 F.Supp.2d 726, 738 (D.Md.2004) (citing *King*) (holding that the plaintiff's "subjective opinion that she was performing satisfactorily is insufficient to satisfy this element"); *cf. Watkins v. Hospitality Group Mgmt. Inc.,* No. 1:02CV00897, 2003 WL 22937710, at *9 (M.D.N.C. Dec.1, 2003) (citing *King*) (holding that the plaintiff satisfied this element

by offering evidence that she had in fact fulfilled all the responsibilities the employer conceded were necessary for her to keep her job), *recons. denied,* 2004 WL 444572 (M.D.N.C. Feb.11, 2004), *appeal docketed,* No. 04–1401 (4th Cir. Apr. 5, 2004).

The Court finds, therefore, that Plaintiff has failed to show element three of his prima facie case for discriminatory discharge. As such, Plaintiff's claim of discriminatory discharge fails as a matter of law.

### 3. Conclusion with Respect to Plaintiff's Title VII Claims

In summary, therefore, the Court agrees with Plaintiff to the extent that he has offered evidence, if true, that Defendant, in particular Parks and Beam, may have treated him unfairly. While the Court understands Plaintiff's arguments, the Court nevertheless finds that Plaintiff has failed to demonstrate a prima facie case of either discriminatory enforcement of disciplinary measures or discriminatory discharge *on the basis of his race.* The Court must therefore dismiss Plaintiff's Title VII claims for discriminatory enforcement of disciplinary measures and discriminatory discharge with prejudice.[16]

### C. Wrongful Discharge Under North Carolina Law

▮▮▮▮ Plaintiff next contends that his termination violates the public policy of North Carolina as articulated in the North Carolina Equal Employment Practices Act. *See* N.C. Gen.Stat. §§ 143–422.1 to – 422.3.[17] Section 143–422.2 states that "[i]t is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race ... by employers which regularly employ 15 or more employees." Defendant does not dispute that the North Carolina courts have recognized wrongful-discharge claims arising out of claims of racial discrimination. It contends, however, that because it is entitled to summary judgment on Plaintiff's Title VII claim for racial discrimination, it is also entitled to summary judgment on Plaintiff's state-law claim for racial discrimination.

The North Carolina Supreme Court has held that the evidentiary standards used in Title VII cases are also applicable in wrongful-discharge cases because the ultimate purpose of both Title VII and the NCEEPA is "the elimination of discriminatory practices in employment." *N.C. Dep't of Corr. v. Gibson,* 308 N.C. 131, 141, 301 S.E.2d 78, 85 (1983); *accord*

---

**16.** As the Court noted in footnote 9 above, Plaintiff also appeared to be claiming in his Response Brief that Defendant discriminated against him by failing to pay him all the wages he was owed. The Court, however, found that Plaintiff had failed to raise this claim in his EEOC charge and was therefore barred from bringing it. The Court notes, however, that even if Plaintiff could properly assert such a claim, it would fail on the merits for substantially the same reasons that Plaintiff's properly alleged Title VII claims have failed, that is, Plaintiff has failed to demonstrate a genuine issue of material fact that Defendant's actions were motivated by Plaintiff's race.

**17.** As the Court noted in footnote 9 above, Defendant also appeared to be alleging a retaliatory discharge claim in his Response Brief. The Court concluded that Plaintiff had failed to raise such a claim in his Complaint and therefore held that Plaintiff could not now raise such a claim. The Court further notes that even if Plaintiff had alleged a retaliatory discharge claim in violation of the public policy of North Carolina, such a claim would fail as a matter of law because North Carolina does not recognize retaliatory discharge claims. *See Ijames v. Murdock,* No. 1:01CV00093, 2003 WL 1533448, at *7 (M.D.N.C. Mar.21, 2003) (collecting cases).

*Brewer v. Cabarrus Plastics, Inc.,* 130 N.C.App. 681, 686, 504 S.E.2d 580, 584 (1998) (citing *Gibson*) (holding that the North Carolina Supreme Court "has adopted the evidentiary standards and principles developed under Title VII" for state-law wrongful-discharge claims). The Fourth Circuit Court of Appeals and the Middle District have consistently held that a plaintiff's failure to demonstrate his discrimination claim under Title VII will also result in dismissal of a North Carolina wrongful-discharge claim arising out of the same facts and circumstances. *See, e.g., Hughes v. Bedsole,* 48 F.3d 1376, 1383 (4th Cir.1995) (citing *Gibson*); *Kimes v. Lab. Corp. of Am., Inc.,* 313 F.Supp.2d 555, 561 n. 4 (M.D.N.C.2004) (citing *Hughes & Gibson*). Because the Court has dismissed Plaintiff's Title VII claims for failure to demonstrate a genuine issue of material fact that he was the victim of unlawful discrimination, the Court must also dismiss Plaintiff's state-law wrongful-discharge claim.

### D. Loss of Consortium

 Plaintiff Yvonne Jones also claims that due to Defendant's discrimination against her husband, Plaintiff Tucson Jones, she suffered loss of consortium and services and is therefore entitled to damages from Defendant. As the North Carolina Supreme Court held in *Nicholson v. Hugh Chatham Memorial Hospital,* 300 N.C. 295, 304, 266 S.E.2d 818, 823 (1980), "a spouse may maintain a cause of action for loss of consortium due to the negligent actions of third parties so long as that action for loss of consortium is joined with any suit the other spouse may have instituted to recover for his or her personal injuries." Yvonne Jones' claim for loss of consortium is thus derivative of Plaintiff's Tucson Jones' claims, and her claim is therefore wholly dependent on the survival of his claims of discrimination. *See Labram v. Havel,* 43 F.3d 918, 921 (4th Cir.

1995); *Emmons v. Rose's Stores, Inc.,* 5 F.Supp.2d 358, 366 (E.D.N.C.1997) (citing *Nicholson*), *aff'd per curiam,* 141 F.3d 1158 (4th Cir.1998); *Darnell v. B.P. Exploration & Oil, Inc.,* No. 2:96CV00647, 1997 U.S. Dist. LEXIS 11343 at *15–16 (M.D.N.C. July 8, 1997) (citing *Labram & Nicholson*), *aff'd per curiam,* No. 97–2040, 1998 U.S.App. LEXIS 4651 (4th Cir. Mar. 13, 1998). Because the Court has dismissed Plaintiff Tucson Jones' claims, Plaintiff Yvonne Jones' derivative claim for loss of consortium fails as a matter of law.

### V. CONCLUSION

In summary, therefore, Plaintiffs have failed to demonstrate a genuine issue of material fact with respect to any of their claims. As such, Defendant's Motion for Summary Judgment [Document # 12] is granted in all respects, and Plaintiffs' claims against Defendant are dismissed with prejudice. In addition, Plaintiffs' purported Motions to Dismiss Defendant's Motion for Summary Judgment [Documents # 11, # 17] are denied.

An Order and Judgment consistent with this Memorandum Opinion shall be filed contemporaneously herewith.

### ORDER AND JUDGMENT

For the reasons stated in the Memorandum Opinion filed contemporaneously herewith,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Plaintiffs' purported Motions to Dismiss Defendant's Motion for Summary Judgment [Documents # 11, # 17] are DENIED.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant's Motion for Summary Judgment [Document # 12] is GRANTED in all respects, and Plaintiffs' claims against De-

fendant are hereby DISMISSED with prejudice.